Exhibit

L

ORIGINAL

1    STATE OF NEW YORK: COUNTY OF CAYUGA

2    AUBURN CITY COURT

3    _____

4    PEOPLE,

5                                        **PRELIMINARY HEARING**

6              v.                   File No. 16-0258

7

8    JKENDRIC AGEE,

9

10   _____

11                                         157 Genesee Street,
                                           Auburn, NY 13021
12   Before:                               March 15, 2016

13                    HONORABLE MICHAEL MCKEON,
                              Justice
14

15                   Brian T. Leeds, Esq.,
                  Assistant District Attorney
16
                   Timothy J. Brennan, Esq.,
17                Attorney for Jkendric Agee

18

19

20

21   _____

22                   Baker Transcription Service
                             321 Troy Road
23                     Ithaca, New York 14850
                     Telephone: (607) 207-6332
24

25

1

1    THE COURT:  Good afternoon, sir.

2    MR. AGEE:  Good afternoon, sir.  How are you

3    doing?

4    THE COURT:  Alright, Mr. Agee, you're here

5    with your attorney, Mr. Brennan.  You have a pending

6    charge of promoting prison contraband in the second

7    degree, or possession of dangerous contraband in the

8    first degree, excuse me, which is a class D felony.

9    This case is on for a preliminary hearing for this

10   afternoon.  Are we…  Is there any resolution of this

11   case?  Are we proceeding to a, the preliminary hearing,

12   counselors?

13   MR. AGEE:  Yes.

14   THE COURT:  Mr. Leeds?  Alright, sir.  Mr.

15   Leeds, you're  prepared to go forward?

16   THE PEOPLE:  We are, Judge.

17   THE COURT:  And…

18   ATTY. BRENNAN:  Yes, Your Honor, my client

19   beat me to it, but yes, we are already prepared to go

20   forward.

21   THE COURT:  Okay.

22   ATTY. BRENNAN:  There was an offer by the

23   District Attorney's office.  I believe it was reduction

24   down to the E felony of attempted prison contraband.

25   THE COURT:  Okay.

1    ATTY. BRENNAN:  A sentence of one and third to

2  four.

3    THE PEOPLE:  One and half to three.

4    ATTY. BRENNAN:  Or one and half to three, Your

5  Honor, and my client is indicating that he wants to

6  reject that.

7    THE COURT:  Is that correct, Mr. Agee?

8    MR. AGEE:  Yes, sir.

9    THE COURT:  Okay.  Before I, we go forward

10  with the prelims, I want to make sure that you're aware

11  of all the negative consequences that could come from

12  not waiving your preliminary hearing.  From what heard

13  by counsel, if you did elect to waive your right to a

14  preliminary hearing, they would reduce it to a class E

15  felony and your sentence would be a maximum of 2 to 4.

16    ATTY. BRENNAN:  Three and a half to seven, I

17  believe.

18    THE COURT:  I'm sorry, E felony 3-1/2 to 7, E

19  felony 2 to 4, correct?  D felony?

20    THE PEOPLE:  Yes, Judge.

21    ATTY. BRENNAN:  Yes.

22    THE COURT:  So 1-1/2 to, you said 1-1/2 to 3?

23    THE PEOPLE:  One and a half to three, yeah.

24    THE COURT:  So 1-1/2 to 3 vs. possibly 3-1/2

25  to 7 is the maximum exposure if you go to trial and are

1    convicted of the prison contraband first.  So there is a

2    difference of a 1-1/2 to 3 vs. 3-1/2 to 7.  So I just

3    want to make sure that before you make that final

4    decision and Mr. Leeds calls his first witness, which at

5    that point in time the offer would be withdrawn, and

6    then you're left to either try, you'll be left to

7    pleading to the, the possession first charge in County

8    Court or seeking a, going forward with indictment and a

9    jury trial if in fact you would be indicted.  So, those

10   are the parameters here, Mr. Agee.  I just want to make

11   sure that you understood all of that and that you are

12   proceeding, you wish to proceed with your felony hearing

13   understanding the possible negative consequences that

14   could impact you in terms of a future sentence.  So do

15   you understand all of that?

16         MR. AGEE:  Yes, sir.

17         THE COURT:  Alright, so you understand you

18   could get 3-1/2 to 7 if you plea, if you are found

19   guilty after trial?

20         MR. AGEE:  Yes, sir.

21         THE COURT:  Well keep in mind this hearing is

22   only to determine whether there is probable cause or

23   reasonable cause as the statute indicates that you

24   committed a felony offense.  That's the burden at a

25   preliminary hearing.  I want to make sure you understand

4

1  that as well. It's not proof beyond a reasonable doubt.

2  That a preliminary hearing is essentially more probable

3  than not that you committed a felony, to widely

4  different burdens of proof.  So want to make sure you

5  understand that as well.  Do you understand that?

6        MR. AGEE:  Yes, sir.

7        THE COURT:  Alright, having said all that, you

8  are electing to proceed forward with your preliminary

9  hearing, is that correct?

10        MR. AGEE:  Yes, sir.

11        THE COURT:  Okay.  Okay, then let's proceed.

12  Have a seat over there, gentlemen and we'll start the

13  preliminary hearing.

14  [BREAK]

15        THE COURT:  Mr. Brennan?

16        ATTY. BRENNAN:  Yes, Your Honor.

17        THE COURT:  Is he prepared to go forward?

18        MR. AGEE:  Yes, sir.

19        THE COURT:  Okay.

20        ATTY. BRENNAN:  Yep, he's prepared to go,

21  Judge.

22        THE COURT:  Alright, and are you withdrawing

23  your proposed disposition, counselor?

24        THE PEOPLE:  Yes, correct at this time, Judge,

25  yes.

5

1        THE COURT:  Okay.  The offer to plea to an E

2   felony is hereby withdrawn.  Alright, this is

3   preliminary hearing on one charge on promoting dangerous

4   contraband in the first degree in violation of penal law

5   section 205.25 of the penal law of the state of New York

6   of the…  Do, do Mr. Brennan, do you waive the reading of

7   the entire charging documents?

8        ATTY. BRENNAN:  Yes, Your Honor.

9        THE COURT:  Reading is waived.  Call your

10  first witness, counselor?

11       THE PEOPLE:  People call Corrections Officer

12  Keith Vincent.

13       THE COURT:  Mr. Vincent?  Will…  Oh you're

14  right here.  Oh okay.  Have a seat.

15

16  K E I T H   V I N C E N T, having been called as a witness,

17  having been duly sworn, testified as follows:

18

19       THE COURT:  Have a seat.  Okay.  Make sure

20  that, that everyone can hear you.  So push the towards

21  him, put that towards a little bit there mic, two mics.

22       OFFICER VINCENT:  Okay.

23       THE COURT:  Mic.  Okay.  Your witness, Mr.

24  Leeds.

25       THE PEOPLE:  Thank you, Judge.

6

1   DIRECT-EXAMINATION BY THE PEOPLE:

2        Q    Good afternoon.  Can you state your name please?

3        A    Keith Vincent.

4        Q    And where do you work?

5        A    Auburn Correctional Facility.

6        Q    What kind work do you do for Auburn Correctional

7   Facility?

8        A    I'm a third officer in dog block, in D block.

9        Q    You're a correction officer?

10       A    Yes, sir.

11       Q    And how long have you been a corrections officer?

12       A    Almost 12 years, sir.

13       Q    Specifically, how long have you been at the Auburn

14  Correctional Facility?

15       A    I got there in 2005, August 2005, I think.

16       Q    Okay, what kind of prison is Auburn Correctional

17  Facility?

18       A    It is a maximum security prison.

19       Q    Okay and that's a detention facility?

20       A    No, it's max security.

21       Q    The prison itself it's a detention facility?

22       A    Yes, sir.

23       Q    Okay.  What kind of responsibilities do you have

24  generally speaking as a corrections officer at Auburn?

25

7

1      A     Primarily, security magnet, keep fellow officers,
2  civilian staff, as well as other inmates in a safe manner, so
3  they can carry out their time.

4      Q     Do you have a specific section of the prison you're
5  assigned to with specific responsibilities?

6      A     Yes, sir.  I work in dog block, which is one
7  particular block there.

8      Q     Dog block meaning D Block?

9      A     D Block, yes, sir.

10     Q     Okay and that's a residential area of the prison?

11     A     Yes.

12     Q     Okay.  I want to take you back now to February 28th,
13 2016.  Do you recall if you were working that day?

14     A     I was working, sir.

15     Q     And during your, your shift while you were on duty,
16 did you have a, an incident with an inmate named, JKendric
17 Agee?

18     A     I did, sir.

19     Q     Okay.  First off, did you see Mr. Agee in the
20 courtroom today?

21     A     Yes, he's sitting over there.

22     Q     Can you just maybe describe what he's wearing?

23     A     He has on his orange jump suit.

24     Q     Okay.  At the time February 28th, 2016 was Mr. Agee
25 an inmate at Auburn correctional Facility?

8

1    A    Yes, he was.

2    Q    Okay.  Tell us a little bit about the incident

3 itself.  I guess start from the very beginning.  What, just

4 prior to the incident with Mr. Agee, what are you doing?

5    A    At that time we were running (inaudible) recreation

6 out to the recreation yard.  What we do is there's a four man

7 team, two men go down to the cell.  We open up the cell.  The

8 inmates steps out of the cell.  They pat frisk them.  As long

9 as he is in compliance, at that point in time, he walks off

10 the end of the company to the front.  At that point is where

11 we wand the inmates with a handheld metal detector.  If the

12 inmate is to clear that metal detector, then he will proceed

13 to the yard, the recreational key pen, the yard.  If they do

14 not we will further investigate to figure out why the metal

15 detector would, would be sounding.  In that particular day,

16 he came off.  We were, I was hand wanding him.  The wand kept

17 going off in the front right waistband area.  At that time, I

18 further examined it which he, there was a, appears to be what

19 was a state issued altered razor blade with a black tape

20 handle on it.

21    Q    I want to back up a little bit now.  So, that is

22 the, do you remember what time this was roughly?

23    A    It was probably...  We start running at nine o'clock

24 in the morning roughly.  So, it was probably somewhere, 9:15,

25 9:20.  It's stated on the actual incident report

9

1  approximately what time it was.  I would say it was somewhere
2  right around that neighborhood of time.

3      Q    Okay and you're in the D block area running inmates
4  out to you said, the key block recreation?

5      A    Yes, sir.

6      Q    Explain a little bit about I guess what's key block
7  and how it is differentiated between other inmates?

8      A    An inmate place on key block status is that he has
9  priorly broken some rule.  We don't know necessarily what
10  they are and through the prison system, they have a system to
11  where they can key block an inmate, which means that he
12  doesn't go to normal program.  He eats in the cell, he stays
13  in his cell, he gets taken out to one hour of rec for the
14  day.  So, it's kind of a, a baseline of a little bit of…  I
15  don't want to say a punishment, but something they do so that
16  he actually does his time separately from whatever infraction
17  that he had prior.

18      Q    When inmates under key blocks supervision are being
19  allowed to use the recreation time, are they escorted as a
20  group or individually?

21      A    Individually.

22      Q    Okay and you…  I think you touched on this, but as
23  you're escorting inmates in the key block program, key block
24  supervision and out to recreation, describe a little bit
25  about the, I guess the security procedures that you do once

1  you're removing the inmate from the cell.  I mean, what
2  happens when they're taken from the cell to the yard
3  traditionally?

4      A    Again, they're initially frisked, they come off.
5  The officers, the two officers that are (inaudible) will
6  actually just go to the next cell.  The inmate will walk off
7  to where there's anywhere between two and three other
8  officers.  That's where the, the, we wand them with the metal
9  detector.  At that time from there, they'll walk down the
10 stairs.  Check in at the first officer's desk letting them
11 know which cell that they, they're out of then, they proceed
12 out to the recreational pens at that point in time.  After
13 everybody from their blocks are out there, the pens are
14 secured and then, there's a couple officer's that oversee the
15 recreation while that's going on.

16     Q    Okay.  When the inmates are, I guess, wanded, are
17 they done like, one at a time?

18     A    Yes.

19     Q    Or do they wait in line?

20     A    No.  They, we…  We never have the inmates while
21 we're moving them out in a group per say.  They come out one
22 at a time.  They wanded one at a time and then they proceed
23 out and the next inmate comes out and that same procedure.

24     Q    And where exactly in the, the prison itself or d
25 block itself do you do the wanding?

1     A    The wanding is done on the front of the company.
2  How do we… They have each layer, each floor as you go up you
3  have sides and so like, one side would be two company.  That
4  would go down the opposite side in dog block it's called
5  seven company.  In the front of that area is where we have
6  the controls to each of the cells and there's a landing
7  that's approximately 10 or 12 feet deep as wide as the block
8  is and in that area there is where we actually would do the
9  wanding.

10     Q    When you were doing the wanding of Mr. Agee, were
11  there any other inmates in that area at the time?

12     A    Nope.

13     Q    Okay.  You're saying no?  I didn't…  You're shaking
14  your head, but no?

15     A    No.  No.

16     Q    Okay.  Now, the wanding itself, that's a handheld
17  metal detector?

18     A    Yes, that's correct.

19     Q    What area of Mr. Agee's person did that metal
20  detector go off?

21     A    It was going off in his mid-section up around the
22  right front, front side.

23     Q    Okay and after you get the alert from the wand,
24  what, what do you do with Mr. Agee?  I mean, how do you
25  conduct your next level of search?

1       A       At that point in time I just pretty much, you know,

2  just, you know, remain there.  Felt along his waistband

3  there.  Felt something, pulled the waist band down and the

4  razor blade was actually right there.

5       Q       Okay.  The, the item that you found, the razor

6  blade, was it just a regular razor blade, was it modified in

7  any way or wrapped in anyway?

8       A       Yeah, it was… Again, it looked, appeared to be the

9  blade out of a state issued razor that was wrapped with black

10  electrical tape and it had a, a sheath to go over the actual,

11  the actual blade.

12       Q       Okay and that was found right in his waistband or

13  around his waistband?

14       A       Yes.  Right along his waistband, yeah.

15       Q       Okay.  Now, are you familiar with the rules

16  concerning contraband inside the prison?

17       A       As far as promotion of contraband and everything of

18  that nature or?

19       Q       What items that would be considered contraband,

20  items that wouldn't be considered contraband?

21       A       For, for the most part absolutely.

22       Q       The item that you found off of Mr. Agee, would that

23  be considered contraband?

24       A       Yes, sir.

25

13

1      Q     Would there be any circumstance where that item
2  would be allowed in the possession of Mr. Agee?

3      A     Not in, in the form of which it was in.  Again, if
4  it was in the state razor and it was issued that way.  It was
5  an altered item to be used in a purpose other than its
6  intent.

7      Q     Okay.  If, if it was in the, the regular razor
8  form, would he be allowed to remove it from his cell in his
9  waistband?

10     A     No.  No.

11     Q     Okay.  Have you seen items like the one you took
12 off Mr. Agee in the prison before?

13     A     Absolutely.

14     Q     And what did the inmates use those items for?

15     A     They usually like to slash each other primarily in
16 the facial area.

17     Q     Have you seen injuries like that?

18     A     Absolutely.

19     Q     And when you say slashes, I mean, can you describe
20 some of the injuries you've seen with items like that?

21     A     Well, I've seen guys with their ears dangling off.
22 Their whole entire side of their mouths open, cuts all the
23 way across their nose, nose peeled down, several cuts, heads,
24 faces.  I mean, I've seen guys with their necks sliced open,
25 quite a bit over, over my career.

1    Q    Would the item be found off of Mr. Agee be

2 considered a weapon inside the prison?

3    A    Yes.

4    Q    And in your experience, your opinion, would that be

5 a dangerous contraband item to have in the prison?

6    A    Yes, absolutely.

7    Q    Okay.  Once the, the item is removed from Mr. Agee,

8 I guess, what's the next thing that you do?

9    A    We actually took and secured him with handcuffs,

10 mechanical restraints.  I notified the area supervisor at

11 which time he made arrangements and he was escorted to SHD

12 which is the maximum SHOE, Special Housing Unit. He was

13 escorted up there and after that, those guys processing in

14 and, and that's as far as I have to do with that.

15    Q    What happens to the razor?

16    A    The razor is actually, goes into the evidence

17 locker.  We measure it.  We take pictures of it, secure it.

18 It goes into an evidence locker.

19    Q    Nothing further from me.

20

21        THE COURT:  Thank you, Mr. Brennan, cross

22    examination?

23        ATTY. BRENNAN:  Thank you, Your Honor.

24

25

1  CROSS-EXAMINATION BY ATTY. BRENNAN:

2      Q    Let's back up a bit.  When you initially pull an

3  inmate out of their cell, the person initially leaves their

4  cell, explain to me what happens at that point to the inmate?

5      A    As far as during key block recreation?

6      Q    Yeah.  Yeah.

7      A    During that time?

8      Q    Yeah where my client would've been out.

9      A    Oh excuse me.

10     Q    The initial part of my client was pulled out of his

11  cell, explain to me what would happen to him at that point?

12     A    There's two officers down there.  He's made to face

13  one officer that…  Well, prior to that they actually go down…

14  If he's taken to jacket out and his shoes, he places them on

15  the bars.  They search that.  If everything is good at that

16  point in time, we open up the cell.  When he comes out of his

17  cell, the officers at that point in time will actually

18  conduct a pat frisk.

19     Q    Okay.

20     A    As long as everything goes from there, then he

21  proceeds to the next.

22     Q    So, you're testifying that there would've been two

23  officers at the time that my client leaves his cell?

24     A    Correct.

25

1      Q      And what are those names of the officers that were
2  on…

3      A      I honestly do not recall who was doing that search.

4      Q      Okay, but you are sure that there would've been two
5  officers at that time that would've done this…

6      A      Absolutely.

7      Q      This frisk?

8      A      Absolutely.

9      Q      Okay.  So, when my client leaves his cell, is he
10 facing out towards, right towards an officer when he's being
11 frisked?

12     A      That's correct.

13     Q      Is he looking the officer right in the face
14 basically?

15     A      Yep.

16     Q      Okay and another officer is doing a pat frisk?

17     A      That officer does not do the pat frisk.  That
18 officer actually observes him.  That officer that is behind
19 him, does the pat frisk.

20     Q      Okay.  So, the officer standing behind my client
21 would be patting him down?

22     A      That is correct.

23     Q      And describe to the Court what a pat frisk actually
24 is?

25

1      A     A pat frisk, everybody has their own kind of method

2   of doing it, but normally you start in the arms area as you

3   search the arms running your hands over the materials, run

4   your hands down the chest area around the back, the sides,

5   waist line, go down the legs and you know, one leg at a time

6   and that's it.

7      Q     And during a pat frisk, does an officer actually

8   apply pressure to a person to, to form their hands around the

9   body itself?

10     A     No.

11     Q     So, he would just, a simple just kind of rubbed the

12  guy and down and doesn't...

13     A     Pretty much.  Yes, sir.

14     Q     Okay.  So, you have two officers, my client's

15  facing one of them and you have another officer behind him

16  doing the pat frisk as you've just described and you're

17  indicating that at that time they would not have found this,

18  this razor blade apparently, allegedly that he had?

19     A     Yeah.

20     Q     Okay.  Is that possible if they were doing a pat

21  frisk the correct way?

22     A     It's very possible.

23     Q     They...

24     A     It's very possible.

25     Q     Okay.

18

1     A    We're not perfect people.

2     Q    Okay and where do you… As far as his waistband,
3 explain to be what a prison waistband would be?  I mean, is
4 it… Are there pockets in the waistband or is just a, is it
5 enclosed?

6     A    No, it's in… There's two different types of
7 waistbands.  You have elastic waistbands, as well as just
8 your traditional pant waistband.

9     Q    Okay.  Did my client have an elastic waistband on
10 at that time?

11     A    Yes, I believe he did have that.

12     Q    Okay.  You indicated that as far as where in the
13 waistband was it?  Was it… I guess on his body could you
14 describe where the waist band?

15     A    It was more, almost center on his body, but a
16 little bit to the right hand side.

17     Q    Okay.

18     A    Right in the front of the waistband.

19     Q    Okay.  Was it more tucked into the waistband?  Was
20 it inside?  Is it a drawstring waistband I guess is what I'm
21 getting at?

22     A    No, not a drawstring.

23     Q    Okay.  So, would there have been a hole in the, in
24 the pants themselves?

25

19

1      A     There was not to the best of my knowledge, there
2   was not one in his.

3      Q     Okay.  So, there was no holes is what you're
4   testifying.  There was no hole in the actually pants?

5      A     To the best of my knowledge.  I did not take his
6   pants off.

7      Q     Okay.

8      A     And go through them in that type of manner.

9      Q     Was, was his pants taken into evidence?

10     A     Not that I'm aware of.

11     Q     Okay.  Okay.  When he, when an individual leaves
12  his cell passing, passed where we just talked about as far as
13  the frisk.  What happens after that?  They do a wand is what
14  you testified to?

15     A     Yes, that is correct.

16     Q     Okay and the wand is essentially, it's a metal
17  detector, correct?

18     A     Correct.

19     Q     Okay.  Now, you're alleging that this, my client
20  had a razor blade that was wrapped in what, what type of
21  wrapping was it?

22     A     It was what would appear to be black, electrical
23  tape.

24

25

1    Q    Black electrical tape and does black electrical

2    tape do anything to a magnetic device as far as a, as far as

3    a wand would be concerned?

4    A    Honestly, I couldn't answer that question yes or

5    no, because I do not know.

6    Q    You are the one who did the wanding though, you're

7    testifying, correct?

8    A    Yes, that is correct.

9    Q    Okay.  Do you have training on how to use a wand?

10   A    Yes.

11   Q    Do they go through the specifications of what a

12   wand can detect and what a wand can't detect?

13   A    No.  No.

14   Q    Okay.  So, you've never had any training as far as

15   if a razorblade has been disguised or not, if, if that would

16   actually be detectable by a wand?

17   A    I would say no.

18   Q    Okay.

19   A    I know there's certain razorblades that do detect

20   it, certain razorblades that don't.

21   Q    And how long have you been working on that block

22   itself or does it change?

23   A    You know I've had been in there probably, to the

24   best of my knowledge, I've been in there since September

25   timeframe, prior to that I had two other (inaudible) in that

1  block totally.  I've worked in that block consistently for

2  probably about five years.

3      Q    Okay and part of your duties, are they consistently

4  that you're the person doing the wanding?

5      A    No.

6      Q    Okay.  Is that just something that alternates

7  between corrections officers?

8      A    Correct.

9      Q    Okay.  How many people have you wanded in the past...

10  Well, this would've...  You're allegations, this happened

11  around February 28th, correct?

12      A    Yep, that's correct.

13      Q    In that period of time, how many weapons did you

14  find on inmates?

15      A    As far as that day?

16      Q    No, in that week.  Did you find weapons on any

17  other inmates that week?

18      A    I do not believe so.

19      Q    So your statement...  Let me ask you, did you

20  actually write a, a memorandum itself that was sent up the

21  chain, I guess, to Sergeant...

22      A    There was a, a two from that I turned in to my

23  Sergeant, as well as the, the misbehavior report.

24      Q    Okay.  That sergeant, there's a sergeant...  Forgive

25  me.  Is it Sergeant Valfleck [sp]?

1      A      Vanfleet [sp].

2      Q      Vanfleet [sp].  Okay.  In that report, did you
3 indicate that you found this, this alleged razor that you
4 found in his waistband after a wanding?

5      A      Yes.

6      Q      Okay.  Do you remember what you wrote in that
7 report?

8      A      Briefly, but not verbatim, absolutely not.

9      Q      Did you ever talk to a state trooper in regards to
10 this incident?

11     A      In regards to this incident?

12     Q      Yes.

13     A      No.

14     Q      No.  Okay.  So, at one point this state trooper…
15 How does it work?  When somebody gets arrested from the
16 prison?

17     A      I have no idea, sir.

18     Q      Okay.  So, you don't actually have any contact as
19 far as when you write your memorandum, it just goes up the
20 chain of command?

21     A      That is correct.

22     Q      Okay and have you ever had a chance to review the
23 complaint that was filed by State Trooper Stover [sp]?

24     A      No, sir.

25     Q      No.  Okay.

1           ATTY. BRENNAN:  Give me one second, Your

2       Honor.

3           THE COURT:  Sure.

4

5       Q    Specifically, could you just, just rephrase.  We

6   had asked where specifically you had found the razorblade.

7   Could you state for the record one more time exactly where

8   you found this razorblade, alleged razorblade on him?

9       A    It was in the front right area of his waistband.

10      Q    Okay.  Thank you.

11

12          ATTY. BRENNAN:  Just one second, Your Honor.

13          THE COURT:  Take your time, counselor.

14          ATTY. BRENNAN:  Thank you.

15

16      Q    What cell, what cell does my client, was my client

17  occupying at that time?

18      A    I couldn't tell you exactly, but…

19      Q    Okay.  How many cells would've been on the tier?

20  Is it a tier I'm talking about?  Sorry.  How many cells would

21  be on that block or tier if I'm using the right term?

22      A    48.

23      Q    48.  Okay.

24      A    I believe he was in 28, but I'm not a 100% sure.

25      Q    Okay.

24

1

2          ATTY. BRENNAN:  If I could just show him the

3   statement that he had…

4          THE COURT:  Sure.

5          ATTY. BRENNAN:  He had actually submitted…

6          THE COURT:  Go right ahead, counselor.  Mark

7   it down.  Mark it as Defendant's one.  Alright.

8   Defendant's A rather.

9          ATTY. BRENNAN:  Really, Your Honor, the

10   purpose is just to refresh memories.

11          THE COURT:  Okay.  I always like to mark

12   anyhow.

13          ATTY. BRENNAN:  Yes, sir.

14          THE COURT:  Exhibit A.  Okay.

15

16     Q    And just specifically in those memorandums, do you

17   normally note exactly, the exact location of where the

18   individual would be housed?

19     A    In this specific one?

20     Q    Yeah.

21     A    It's not necessary.

22     Q    Okay.  So, procedurally, it essentially does…  It's

23   not part of your procedure?

24     A    Absolutely not.

25     Q    You don't normally put in there?

1   A   No.

2   Q   Okay.  Is the, is his housing unit located in that

3   document?

4   A   It is.

5   Q   It is.  What's the document say is…

6   A   This is D block.

7   Q   Okay.  Does it specifically say cell or is it just

8   the d block location?

9   A   It just says d block.

10  Q   Okay.  Thank you.

11

12          ATTY. BRENNAN:  That's all I had for the

13      document, Judge.

14          THE COURT:  Okay.  Any other questions, Mr.

15      Brennan?

16

17  Q   Where would the razor be, the razor in question,

18  where would it be located at this time?

19  A   It would be at Auburn Correctional Facility in the

20  evidence locker.

21  Q   Okay and again, that's not normally…  That I guess

22  goes beyond what you would normally do as far as where the

23  evidence is housed.  So, you wouldn't know if it gets

24  transferred anywhere else?

25  A   We have an evidence drop box.

1    Q    Okay.

2    A    I do my paperwork on it.  At that time, I turn it

3 over and place it into the evidence lock box.  From that, I

4 do not know.

5    Q    Okay, and you did testify that his pants at that

6 time were not taken as far as you know?

7    A    Yes, as far as I know.

8    Q    Okay.  Would the pants be taken in the same way

9 though if they were at some point taken, dropped in a drop

10 box or would they just be handed over?

11   A    They would be, but I don't see why they would of

12 even had taken the pants.

13   Q    Okay.  So, you had no contact as far as…  Were you

14 interviewed by anybody else regarding this, this incident

15 after your memorandum was submitted?

16   A    No.

17   Q    Okay.  So, you never spoke to a supervisor about

18 this?  It was just you fill out the memorandum and pass it

19 up?

20   A    Yes, that is correct.

21   Q    Okay and just, just to establish and clarify.

22 There would've been two guards at the time of the frisk and

23 then you at the wand?

24   A    It was me and another officer.

25

27

1      Q    Okay.  So, two at the time when he leaves the cell
2  and then two when he goes down the tier toward the wanding?
3      A    That is correct.
4      Q    Okay.  How does your statement, the memorandum I
5  had just showed you, how would that make it to the police
6  report?
7      A    I have no idea.
8      Q    Or to the…  You don't know how it would make it
9  into a felony complaint?
10     A    Actually no.
11     Q    Okay.
12
13          ATTY. BRENNAN:  As I am looking at the felony
14     complaint and this was submitted by the District
15     Attorney's office, Your Honor, and I'm wondering why the
16     statement on the felony complaint is the different than
17     the statement that's, that's contained within memorandum
18     to his supervisor, Judge.
19
20     Q    Do you have any explanation for why that would
21  occur?
22     A    Again, as far as any of that, that has nothing to
23  do with myself.  That is above my pay grade.
24
25

28

1     Q    Would it surprise you that the felony complaint

2 mentions that this weapon was found during a pat frisk in

3 front of the cell?

4     A    Would it surprise me?  I guess I would say yes,

5 because that's not where it was found.  If it was it would've

6 been in my statement.

7     Q    And that this felony complaint also mentions the

8 defendants exact cell number that appears D-7-27?

9     A    It's a possibility.

10    Q    Would that be the correct way of labeling the cell

11 number?

12    A    Yep.

13    Q    Okay.

14    A    Yep.

15    Q    And that, as you testified earlier, was not

16 contained within your statement, correct?

17    A    Not on that to/from.  It should be on the

18 misbehavior report.

19    Q    Okay and you didn't, you didn't submit the

20 misbehavior report anywhere else.  That would've been

21 submitted by someone else?

22    A    That's why it goes… Yes, I submit that to the

23 watch commander.  That's it.

24

25

1    Q    Okay, but you wouldn't have had any direct contact

2  with the watch commander after that takes it from there

3  essentially?

4    A    That's correct.

5    Q    Okay.

6

7              ATTY. BRENNAN:  No further questions at this

8        time, Your Honor.

9              THE COURT:  You have redirect, Mr. Leeds?

10              THE PEOPLE:  No redirect.

11              THE COURT:  Now, you filed a misbehavior

12        report also?

13              OFFICER VINCENT:  Yes, that is correct, sir.

14              THE COURT:  And, those are the only two

15        documents that you produced?

16              OFFICER VINCENT:  Yes, sir.

17              THE COURT:  And you don't remember what other

18        officer was working with you at the time of this search

19        or frisk?

20              OFFICER VINCENT:  I don't, sir.

21              THE COURT:  Do you know if he's still working

22        in the same block as you?

23              OFFICER VINCENT:  The problem, the problem of

24        that is sir, is the individuals, the team is of

25        different people from different blocks come into one

30

block to do that. We do this every single day. The
problem of it is, is every day we don't have the exact
same people doing the exact same jobs. So, I can't sit
here for certain and tell you exactly what officers were
working that day. I'm sure that there is a record of
which officers had those jobs that day, but I'm not
gonna…

THE COURT: One would think.

OFFICER VINCENT: One, one think. I'm not
gonna say I believe it was this person if I'm not 100%
sure.

THE COURT: Okay. Okay. Thank you. You may
step down.

OFFICER VINCENT: Thank you, sir.

THE COURT: Any other witnesses, Mr. Leeds?

THE PEOPLE: No, Judge, People rest at this
time.

THE COURT: Sir, Brennan, anything you'd like
to submit or oppose at this base, have anybody testify?

ATTY. BRENNAN: Well, Your honor, my client is
asking, because we do have this statement here from that
felony complaint filed by the state trooper and
essentially I'm wondering the same thing, why our state
trooper is not testifying today, Judge, and my client

1   would like him called as a witness as well.  We do have

2   two conflicting statements at this time, Your Honor.

3   THE COURT:  And as I see it, the, the issue as

4   to whether it was in front of the cell or someplace else

5   may be different, but the, you know, the place of where

6   it was found is irrelevant on a charge of promoting, or

7   felony possessing dangerous contraband (inaudible).  I

8   mean, the issue is did he possess it and there appears

9   to be no discrepancy as to the fact that the, that a 2″

10  long X 1/2″ wide razorblade with the tape and with

11  sheath is certainly consistent with the memorandum

12  submitted with Officer Vincent.  So, I don't see how

13  it's relevant.  So, your application had the trooper

14  testifies denied.

15  ATTY. BRENNAN:  Your Honor, my client also had

16  one more witness that he would like called.  No, Your

17  Honor, we'll all set.

18  THE COURT:  Okay.  Okay.  Proof is closed.

19  Proof is closed.  Okay.

20  [SIDE-TALK]

21  THE COURT:  I don't know what he's doing.  Is

22  he talking to his lawyer?  You can't talk to me, Mr.

23  Agee.  Anything further, Mr. Brennan?

24  ATTY. BRENNAN:  No, Your Honor.

25  THE COURT:  Any arguments, Mr. Brennan?

32

1        ATTY. BRENNAN:  Yes, Your Honor, at this time

2   I believe People have not met their burden, Judge.  As I

3   said before, we do have conflicting statements at this

4   time, Your Honor, and I don't believe what's been

5   presented meets the burden to sustain this charge

6   and keep my client incarcerated.

7        THE COURT:  Thank you.  Mr. Leeds?

8        THE PEOPLE:  Judge, this is a preliminary

9   hearing.  So, we just have to provide enough reasonable

10  basis for the Court to make a decision whether or not a

11  felony offense has been committed.  I do acknowledge

12  that there's probably some discrepancy between what the

13  complaint says and what the officer testified to.

14  However, the complaint, at this stage of the game, is

15  just a piece of paper.  It's just a charge of the

16  document and it's not constituting the proof that we're

17  going forward in this case, which is the testimony and

18  the Officer Vincent.  Based on that testimony, Judge, if

19  you'd look at the elements of promoting contraband in

20  the first degree, I think we've established that Mr.

21  Agee was an inmate in prison.  Mr. Agee was in a

22  detention facility Auburn Prison being one and Mr. Agee

23  was in possession of what would be considered dangerous

24  contraband, in this case, a razor that was fashioned

25  into a weapon housed in a sheath that was found inside

33

1    of his waistband.  So, I believe, Judge, for the purpose

2    of probable cause at this stage, we have established

3    that there is enough to go forward beyond the

4    preliminary hearing.

5              THE COURT:  Okay.  Thank you.  Alright.  Well,

6    after reviewing the testimony, though it certainly

7    would've been preferable that there was the picture of

8    the actually knife produced based on this testimony of

9    the correction officer, his description of it is

10   sufficient for the Court to make a finding that People

11   have met their burden of reasonable cause to believe

12   that Mr. Agee committed a felony in the Auburn

13   Correctional Facility and on that basis, I find

14   reasonable cause and hereby transfer this case to the

15   County Court where all future proceedings will take

16   place.  He is remanded on the same bail, which is $3,000

17   cash, $6,000 bond.  He is remanded.

18             ATTY. BRENNAN:  And Your Honor, this is just

19   (inaudible), because I believe Mr. Leeds has handed it

20   over anyway, but I'd request the Rosario from any

21   statements given today, given what's…

22             THE COURT:  Do you have anything else other

23   than your correction officer's?

24

25

34

1          THE PEOPLE:  No, I gave the full and complete

2     copy of our file at this stage, Judge.  There may be

3     additional paperwork.

4          THE COURT:  Okay.

5          THE PEOPLE:  But for Rosario purposes, that's

6     all that was available.

7          THE COURT:  Okay.

8          ATTY. BRENNAN:  And this…

9          THE COURT:  Well, at some point in time this

10    Behavior Report should be produced at some point in

11    time.

12          ATTY. BRENNAN:  Yes, Your Honor.

13          THE PEOPLE:  We turned that over, Judge.

14          THE COURT:  Oh you turned it over already?

15          THE PEOPLE:  Yes, Judge.

16          ATTY. BRENNAN:  Yeah, I see it, Judge.

17          THE COURT:  Okay.  Very good.

18          ATTY. BRENNAN:  And obviously it probably

19    doesn't apply since they're corrections officers, but if

20    there are any criminal records related to these

21    witnesses, Judge, I would like those as well.

22          THE COURT:  Okay.  I'm sure there's not, but…

23    Okay.  So noted.

24

25