Exhibit Q

# Ex-prosecutor: Cayuga County DA secretly withheld key evidence in 15 cases



Cayuga County District Attorney Jon Budelmann at a news conference in 2011. (Stephen D. Cannerelli | scannerelli@syracuse.com)



By John O'Brien | jobrien@syracuse.com
Follow on Twitter
on October 31, 2016 at 9:05 AM, updated November 02, 2016 at 9:51 AM

AUBURN, N.Y. – Tyrone Matthews could've been sentenced to 23 more years in prison than his case warranted.

He was charged as a drug dealer, not as the guy who brought the dealer and buyer together.

His role as a go-between was spelled out in a police report that was not initially turned over to Matthews' lawyer.

Under the law, a prosecutor has to give accused criminals any evidence that they can use in their defense.

The former assistant Cayuga County district attorney who initially handled Matthews' case told the defense lawyer about the undisclosed police report in January. A judge later ordered the district attorney, Jon Budelmann, to turn it over.

The ex-assistant DA, Jeffrey Domachowski, says Budelmann had ordered him not to disclose the report and secretly withheld similar evidence in 14 other drug cases over the past eight years.

Budelmann fired him in June for bucking the DA's practice of not disclosing evidence to defendants and county grand juries, Domachowski said.

"It's the Dukes of Hazzard out there," Domachowski said. He filed a notice of claim against the county, preserving his right to sue and accusing Budelmann of malfeasance and retaliation.

Budelmann denied the allegations and said Domachowski was fired for unethical conduct.

In Matthews' case, the withheld information showed he was helping a friend get access to a drug dealer, Domachowski said. That's known in criminal cases as the agency defense, where someone is acting as an agent for the buyer.

Courts consider an agent to be less responsible for drug-trafficking than a dealer.

Domachowski wanted to give Matthews' lawyer, Simon Moody, the police report indicating Matthews was an agent. But Budelmann told him not to, Domachowski said.

Domachowski told Moody about the report in January anyway, saying he had an ethical obligation. Three months later, Cayuga County Judge Thomas Leone decided the police report should've been turned over to the defense. He ordered that it be done.

The report says a female friend of Matthews, secretly working as a police informant, met with him in September 2014 to buy cocaine. They went to a drug dealer's home to get the drugs, the report said. She paid Matthews immediately before he entered and he gave her the drugs immediately after leaving the house, according to the report.

Those are all classic elements of the agency defense, Domachowski said. They show Matthews was the middle man who got no benefits from the deal, the former prosecutor said.

The information made a difference once it was disclosed. Moody presented the report and the agency defense to a jury in a Cayuga County Court trial last month. The jury acquitted Matthews of selling heroin and cocaine and convicted him of less-serious drug-possession charges.

Matthews would've faced 25 years to life in prison if he'd been convicted of the drug-trafficking charges, Moody said. Matthews faces no more than two years behind bars on the drug-possession conviction.

"I would've just been another statistic pleading guilty" if Domachowski hadn't revealed the information to Moody, Matthews told Syracuse.com in an interview two weeks ago at the Cayuga County Jail.

"This is not right," said Matthews, 40, who admits he deserved jail time for possessing the drugs. "We shouldn't be doing this."

Matthews would not likely have been indicted on the more serious charges if Budelmann's office had presented the withheld evidence to a grand jury, Moody said.

"The refusal to submit it to a grand jury is not only prosecutorial misconduct, it's unethical," Moody said. "They have an obligation to do that."

The Matthews case was one in which Domachowski started notifying defense lawyers that Budelmann was violating defendants' constitutional right to a fair trial by not disclosing evidence.

In many of the 15 cases, as was true in Matthews', the withheld evidence allowed prosecutors to overcharge a defendant. Domachowski said. There was often enough evidence for a lesser charge, but the withheld evidence would've cleared them of more serious felonies, Domachowski said.

Domachowski told Syracuse.com Budelmann had a practice of secretly withholding such evidence in drug cases.

Budelmann, who's been DA since 2008, responded to requests for an interview by sending an email to Syracuse.com. He said this was the first time in his 24 years as a prosecutor that a co-worker accused him of unethical behavior.

"We deny this disgruntled former employee's baseless allegations and the county will vigorously fight this claim," he wrote. "He was terminated in June due to his own unethical conduct."

Budelmann, questioned by a reporter outside the Cayuga County Courthouse on Friday, would not specify Domachowski's alleged misconduct. Domachowski said he didn't know what Budelmann was talking about.

Moody said he plans to ask a judge to overturn the convictions of one or two other clients, based on Domachowski's information.

"He may have opened a Pandora's Box here," Moody said.

Of the 15 cases Domachowski cited, six involve the failure to disclose evidence that the defendant was acting as an agent, not as the dealer.

Here's the information in the other nine cases that Domachowski says wasn't disclosed, at least initially: Two involve entrapment — defendants who were not inclined to sell drugs being lured into it. Two were undisclosed lab reports. Two involved an undisclosed person in the drug transaction. Two showed the informants stole some of the drugs. One involved the failure to disclose there was a missing video of the drug transaction.

In one of the entrapment cases, the confidential informant was being paid by police, Domachowski said. The informant was unemployed and in need of money, he said. Domachowski said he presented that evidence to a grand jury over Budelmann's objection, and the defendant was cleared.

Seven of the 15 cases are pending. In four cases, the defendants pleaded guilty without knowing of the undisclosed evidence, Domachowski said. In four others, he notified defense lawyers about the evidence and it resulted in a more favorable outcome, he said.

**'It's the Dukes of Hazzard out there," former Assistant**   Domachowski said he confronted Budelmann about the problem repeatedly over the past two years. But the DA insisted the evidence didn't have to be turned over to the defense or presented to a grand jury, Domachowski said.

**District Attorney Jeffrey Domachowski said.**

Budelmann told him some reports couldn't be disclosed because they would reveal secret police practices, Domachowski said. Budelmann has also claimed disclosure of some reports would identify confidential informants, Domachowski said.

Gary Kelder, a Syracuse University law professor, said prosecutors sometimes disagree over whether they're required to disclose a piece of evidence to the defense. Under the law, they must turn over anything that would be favorable to the defense and is material to the question of guilt or punishment, he said.

Prosecutors sometimes disagree over whether the evidence is material, he said.

There are ways of handling situations where the DA's concerned about disclosing police practices or the identity of a confidential informant, he said.

"Those are legitimate concerns," said Kelder, a former prosecutor. "The question is, can they be accommodated by methods other than nondisclosure?"

The information can be redacted, or the prosecutors can take the evidence to the judge and let him or her decide how to proceed, Kelder said.

After realizing Budelmann wasn't going to change the practice, Domachowski started secretly recording their conversations, he said. Domachowski would not provide the recordings to Syracuse.com.

The disagreement over evidence disclosure came to a head June 15, when Budelmann ordered him to resign, Domachowski said in his notice of claim against the county, filed by lawyer Robert Lahm.

When Domachowski reported to work two days later intending to submit his resignation, he was locked out, the claim said. An investigator took Domachowski's office keys and key fob, and cleared out his belongings, the claim said.

Domachowski reported his concerns about Budelmann's practices to the state Attorney General's Office and the Grievance Committee for the Fourth Judicial Department, which investigates allegations of lawyer misconduct.

The firing was retaliation for filing those complaints, his claim said.

Despite Budelmann's orders not to disclose the evidence, Domachowski said he was ethically obligated to do that. He didn't disclose the reports, but started telling defense lawyers early this year about the withheld evidence, he said.

One of them, David Elkovitch, said that if he'd known about the evidence Domachowski revealed, he would not likely have advised his client to plead guilty. That client went to jail on a felony drug sales conviction. He was unaware of evidence that showed he was an agent, not a dealer, Domachowski said.

Elkovitch has tried in vain to track down the client to see if he wants to ask a judge to reopen his case.

That could be happening more often in Cayuga County because of Domachowski's information, Elkovitch said.

Domachowski is a former Onondaga County sheriff's deputy who got his law license and worked for years as a defense lawyer.

After he started as an assistant DA in November 2014, he was surprised to see so many cases in which defendants were acting as agents for drug dealers or were entrapped by police, and the evidence of it was never disclosed, he said.

He came across entrapment and agency cases while he was going through the files and reviewing audio and videotape of the transactions, he said. Some were from cases that were disposed of years ago, he said.

Some of the witnesses who bought drugs said they needed money or wanted a better deal in their own case so they set the defendants up, Domachowski said. In those cases, the evidence of entrapment wasn't initially disclosed to the defense, he said.

Matt Kopecki was one of the 15 defendants affected by withheld evidence, Domachowski said. Kopecki was charged three years ago with possessing concentrated cannabis, or hashish, a more powerful form of marijuana.

Police did a field test on drugs they seized from his home that showed them to be concentrated cannabis, according to a police report.

Kopecki pleaded guilty to the felony charge a year later. Two years after that, in March of this year, he learned about a crime lab report that had not been turned over to his lawyer.

The report showed the drugs were marijuana. It did not say the drugs were concentrated cannabis, which the lab was unable to test for.

If marijuana were the only drug Kopecki was accused of possessing, he would've only been charged with a misdemeanor, based on the amount he had, said his lawyer, Simon Moody.

Moody filed a freedom-of-information-law request with Budelmann's office and received not only the secret lab report, but an email exchange about it. Budelmann had emailed a police investigator before presenting Kopecki's case to a grand jury. He asked if the lab had the ability to detect concentrated cannabis.

It did not, a state trooper wrote in an email.

The report and the emails clearly were items that Budelmann was obligated to disclose under the law, said Kelder, the SU law professor.

"It certainly sounds material to me, because it makes all the difference in the world what the charge is," Kelder said. "Here you've got a lab doing scientific testing and they can't make that determination. So, yeah. It would seem like that should be turned over."

Shortly after learning that the lab tests showed marijuana, Budelmann got a grand jury indictment against Kopecki, charging him with selling concentrated cannabis.

Kopecki, 37, is a 10-year Army veteran who served tours in the Iraq and Afghanistan wars. He said he suffers from post-traumatic stress disorder from the wars, and problems with his back, knees and ankles. He started using marijuana to treat his conditions under a doctor's recommendation when he lived in California, he said.

He was sentenced to five years in prison and 400 hours of community service for the felony conviction. Police seized his gun collection worth $24,000 and his wife's diamond wedding ring, according to a police report.

Kopecki plans to ask a judge to overturn his conviction on the grounds that Budelmann secretly withheld evidence that would've benefited the defense.

*Contact John O'Brien anytime | email | Twitter | 315-470-2187*

**New York's longest-serving prisoners**

Exhibit R

Auburn _____ Correctional Facility

## INMATE MISBEHAVIOR REPORT ♦ INFORME DE MAL COMPORTAMIENTO DEL RECLUSO

| 1. NAME OF INMATE (Last, First) ♦ NOMBRE DEL RECLUSO (Apellido, Nombre) | NO. ♦ NÚM. | HOUSING LOCATION ♦ CELDA |
|---|---|---|
| Agee, J. | 08-R-1474 | D-7-27 |
| 2. LOCATION OF INCIDENT ♦ LUGAR DEL INCIDENTE | INCIDENT DATE ♦ FECHA | INCIDENT TIME ♦ HORA |
| D-block front of 7 CO. | 2-28-16 | Approx 9 AM |

**3. RULE VIOLATION(S) ♦ VIOLACIÓN(ES)**

113.10 inmate shall not possess a weapon.
114.10 inmate shall not smuggle any item from one area to another.

**4. DESCRIPTION OF INCIDENT ♦ DESCRIPCIÓN DEL INCIDENTE**

While I CO. Vincent was working D-block 2nd
officer I was wanding inmates as they were going out
to PK rec. I wanded inmate Agee #08-R-1474 the
wand sounded on inmate Agee's right front waiste
band. at that time I frisked the right front waist
band and found a razor type weapon wrapped
in black tape. with a black type sheath. razor appears
to be a state issue razor blade. Weapon was placed
in evidence locker per directive 4910A. Weapon
measured 1" long by 1/2" wide wrapped in black tape
with sheath.

| REPORT DATE ♦ FECHA | REPORTED BY ♦ NOMBRE DE LA PERSONA QUE HACE EL INFORME | SIGNATURE ♦ FIRMA | TITLE ♦ TÍTULO |
|---|---|---|---|
| 2-28-16 | R. Vincent | | C.O. |

**5. ENDORSEMENTS OF OTHER EMPLOYEE WITNESSES (if any)      SIGNATURES:**

ENDOSOS DE OTROS EMPLEADOS TESTIGOS (si hay)      FIRMAS:  1. _____

2. _____      3. _____

NOTE: Fold back Page 2 on dotted line before completing below.

| 6. WERE OTHER INMATES INVOLVED? | YES ☐ | NO ☒ | IF YES, GIVE NAME & # _____ |
|---|---|---|---|
| ¿HUBO OTROS RECLUSOS ENVUELTOS? | SÍ ☑ | NO ☐ | DE SER SÍ DÉ LOS NOMBRES Y DIN _____ |

7. AT THE TIME OF THIS INCIDENT, WAS INMATE UNDER PRIOR CONFINEMENT/RESTRICTION?      YES ☒   NO ☐
¿ESTUVO EL RECLUSO CONFINADO/RESTRINGIDO PREVIO AL INCIDENTE?      SÍ ☐   NO ☐
  ⎯⎯⎯ OR ♦ O ⎯⎯⎯
AS A RESULT OF THIS INCIDENT, WAS INMATE CONFINED/RESTRICTED?      YES ☒   NO ☐
¿SE CONFINÓ/RESTRINGIÓ AL RECLUSO COMO RESULTADO DE ESTE INCIDENTE?      SÍ ☐   NO ☐

8. WAS INMATE MOVED AT ANOTHER HOUSING UNIT?      YES ☒   NO ☐
¿MUDARON AL RECLUSO A OTRA UNIDAD DE VIVIENDA?   SÍ ☐   NO ☐
IF YES, (a) CURRENT HOUSING UNIT   SHU-D      (b) AUTHORIZED BY   Lt. Quinn
DE SER SÍ, (a) UNIDAD DE VIVIENDA ACTUAL      (b) AUTORIZADO POR _____

9. WAS PHYSICAL FORCE USED?   YES ☐   NO ☒   (IF YES, FILE FORM 2104)
¿SE USÓ FUERZA FÍSICA?   SÍ ☐   NO ☐   (DER SER SÍ, SOMETA EL FORMULARIO No. 2104)

AREA SUPERVISOR ENDORSEMENT _____
ENDOSO DEL SUPERVISOR DEL ÁREA

Distribution: WHITE - Disciplinary Office   CANARY - Inmate (After review) ♦ Distribución: BLANCA - Oficina Disciplinaria   AMARILLA - Recluso (después de la resión)



| NEW YORK STATE **Corrections and Community Supervision**   **DIRECTIVE** | TITLE **Chapter V, Standards Behavior & Allowances** | | NO. 4932 |
|---|---|---|---|
| | | | DATE 1/20/2016 |
| SUPERSEDES      DIR #4932 Dtd. 5/12/2004 | DISTRIBUTION A B | PAGES PAGE 1 OF 19 | DATE LAST REVISED |
| REFERENCES (Include but are not limited to) 7NYCRR Chapter V, Subchapters A and B; Dir. #4403, #4933, #4403 | APPROVING AUTHORITY *Joseph F. Bellnier* | | |

## SUBCHAPTER A   PROCEDURES FOR IMPLEMENTING STANDARDS OF INMATE BEHAVIOR

Part 250     Scope and Interpretation of Rules and Regulations in this Chapter
Part 251     Cases of Inmate Misbehavior
Part 252     Violation Hearing
Part 253     Disciplinary Hearing
Part 254     Superintendent's Hearing

## Part 250  Scope and Interpretation of Rules and Regulations in this Chapter

### Section 250.1  Applicability

(a) The rules and regulations set forth in this Chapter establish procedures to supplement the Department's ordinary programs for inmate indoctrination, guidance, counseling, and training.  They are to be applied for the following purposes:

  (1) Implementation of standards of behavior where an inmate:

   (i) Violates a rule or regulation governing behavior;

   (ii) Fails or refuses to comply with an instruction given by an employee of the Department acting within the scope of official duties in giving such instruction; or

   (iii) Attempts to escape or escapes or engages in any other unlawful conduct; and

  (2) Administration of procedures for granting good behavior allowances ("good time").

(b) The provisions of this Chapter shall apply to all correctional facilities in the Department.

### 250.2  General policies on discipline of inmates.

(a) Disciplinary action is one of many essential elements in correctional treatment.  When applied reasonably and with fairness it not only assists in protection of the health, safety, and security of all persons within a correctional facility, but also is a positive factor in rehabilitation of inmates and the morale of the facility.

(b) Just as the sentencing of inmates by courts, and the techniques used for correctional treatment, must be appropriately varied to fit a complex matrix of individual circumstances and individual conditions, the disciplinary techniques within a correctional facility must be appropriately varied to fit such factors as:

  (1) The particular circumstances involved;

  (2) The overall behavior pattern of the inmate; and

  (3) The problems in and the present atmosphere of the facility.

Consequently, persons vested with responsibility for disciplinary measures in facilities of the Department should not establish rigid structures for disciplinary sanctions, but should consider each situation individually.

(c) Disciplinary action shall be taken only in such measures and degree as is necessary to:

(1) Regulate an inmate's behavior within acceptable limits;

(2) Assist in achieving compliance by the entire inmate population with required standards of behavior; and

(3) Preserve the confidence of all concerned (i.e., the inmate population and the staff) in the administration's sincere belief in and determination to maintain the required standards of behavior.

(4) All control of inmate activities, including disciplinary action, must be administered in a completely fair, impersonal and impartial manner and must be as consistent as possible (given the need for individualized decisions).

(d) Disciplinary measures should not be overly severe. A sound disciplinary program relies upon certainty and promptness of action rather than upon severity.

(e) Disciplinary action must never be arbitrary or capricious, or administered for the purpose of retaliation or revenge.

(f) Corporal punishment is absolutely forbidden for any purpose and under all circumstances.

(g) Mechanical means of physical restraint must never be used for disciplinary purposes. Mechanical means of physical restraint may be used only when necessary while transporting inmates within or outside of the facility, or on orders of the facility Superintendent, and/or a physician when either deems it necessary to prevent injury to the inmate or to others.

## Part 251  Cases of Inmate Misbehavior

Subpart 251-1   Initial Actions in Cases of Inmate Misbehavior
Subpart 251-2   Review Officer
Subpart 251-3   Misbehavior Report
Subpart 251-4   Inmates Assistant
Subpart 251-5   Timeliness

## Subpart 251-1  Initial Actions in Cases of Inmate Misbehavior

### Section 251-1.1  General Policy

All incidents of inmate violations of rules and regulations, inmate misbehavior, and inmate failure or refusal to comply with an instruction given by an employee acting within the scope of his or her official duties shall be handled as quietly and routinely as possible, giving due regard to danger to life, health, security, and property.

Note:  Sections 251-1.2 through 251-1.4 have been repealed.

See Directive #4944, "Use of Physical Force," and Section 251-3.1, "Misbehavior Report."

### 251-1.5  Minor Infractions.

An employee should deal with minor infractions, or other violations of rules and policies governing inmate behavior, that do not involve danger to life, health, security, or property by counseling, warning, and/or reprimanding the inmate, and the employee need not report such minor incidents.

### 251-1.6 Confinement

(a) Where an Officer has reasonable grounds to believe that an inmate should be confined to a cell or room or housing area because he or she represents an immediate threat to the safety, security, or order of the facility or is an immediate danger to other persons or to property, such Officer shall take reasonable and appropriate steps to so confine the inmate.

(b) An inmate also may be confined to a cell or room where such action appears reasonably necessary for protection of the inmate. In any such case, however, the inmate shall not be so confined for more than 72 hours, and within such time period the inmate shall either be:

   (1) Transferred to another housing unit;

   (2) Scheduled for transfer to another facility;

   (3) Released from such confinement; or

   (4) Placed in protective custody.

(c) An inmate who is unable or who refuses to participate in an assigned activity may be confined to a cell or room and, if such inmate has not been excused for medical reasons, the Officer having charge of the inmate shall report such incident to the Superintendent.

(d) If the Officer having charge of an inmate or if any superior Officer has reasonable grounds to believe that an inmate's behavior in a cell or room is disruptive or will be disruptive of the order and discipline of the housing unit, or is inconsistent with the best interests of the inmate or of the facility, such fact shall be reported to the Superintendent or the Officer in charge of the facility and the Superintendent or the Officer in charge of the facility may order confinement in a special housing unit. Any such order shall be in accordance with Directive #4933.

(e)

   (1) An employee who places an inmate in confinement in a cell or room or who places an inmate in a special housing unit pursuant to the provisions of this Section shall report such fact, in writing, to the Superintendent as soon as possible, but in any event before going off duty.

   (2) Reports of confinement shall be made even where confinement was authorized or directed by a superior Officer, but need not be made where confinement:

      (i) Is necessitated by a medically excused inability to participate in an assigned activity; or

      (ii) Was directed by a decision in a Disciplinary Superintendent's Hearing.

(f) The provisions of this Section shall not be construed so as to prohibit emergency action by the Superintendent of the facility and, if necessary for the safety or security of the facility, all inmates or any segment of the inmates in a facility may, on the order of the person in charge of the facility, be confined in their cells or rooms for the duration of any period in which the safety or security of the facility is in jeopardy. In any such case the Superintendent shall immediately notify the Commissioner.

### 251-1.7 Admission to Special Housing Units.

Admission of an inmate to a special housing unit shall be in accord with Directive #4933.

## Subpart 251-2  Review Officer

## Section 251-2.1  Establishment of Review Officer

There shall be at each correctional facility one or more staff members of the rank of Lieutenant or above, to be known as the Review Officer, the number to be dependent upon the needs of the facility.  The Superintendent may, if sufficient reason exists, designate some other employee to serve as the Review Officer.

## 251-2.2  Function of the Review Officer.

(a) The Review Officer shall receive, at least once daily, all misbehavior reports issued at the facility.

(b) Except as provided in subdivision (d) below, the Review Officer shall review such reports and considering the seriousness of the alleged violations of the standards of inmate behavior, refer such reports to the appropriate disciplinary body for action as follows:

(1) Where the violation, if substantiated, would warrant only a penalty of loss of recreation for up to and including 13 days and including the loss of privileges, for a period up to and including 13 days, other than correspondence and visitation privileges, the report shall be referred to the Violation Officer.

(2) Where the violation, if substantiated, would warrant only a penalty of loss of privileges up to and including 30 days, and including confinement to a cell or room (keeplock) for a period up to and including 30 days, the misbehavior report shall be forwarded to the Disciplinary Hearing Officer for appropriate action.

(3) Where the violation, if substantiated, would warrant imposition of a penalty beyond that which may be imposed at a Disciplinary Hearing, the misbehavior report shall be forwarded to the Superintendent for designation of a Hearing Officer to conduct a Superintendent's Hearing.

(c) The Review Officer may dismiss any misbehavior report which fails to state a valid charge, or may return it to be rewritten.

(d) The Review Officer shall refer any report that includes a charge that an inmate has engaged in an act of self-harm in violation of rule 123.10 (item 270.2(B)(23)(i) of Title 7) to the Deputy Superintendent for Security, who shall fulfill the function of the Review Officer and have the authority to dismiss the charge or charges if he or she believes, due to the inmate's mental state or for any other reason, that proceeding to a hearing would serve no useful purpose.

(e) The Review Officer shall review the status of each inmate keeplocked pursuant to a misbehavior report under review, and may order the release of an inmate who is no longer a threat to the safety and security of the facility or to himself or herself.

(f) The Review Officer shall not act as a Hearing Officer in any proceeding arising from misbehavior report which he or she has reviewed.

## Subpart 251-3  Misbehavior Report

## Section 251-3.1  Misbehavior Report

(a) Every incident of inmate misbehavior involving danger to life, health, security, or property must be reported, in writing, as soon as practicable.

(b) The misbehavior report shall be made by the employee who has observed the incident or who has ascertained the facts of the incident.  Where more than one employee has personal knowledge of the facts, each employee shall make a separate report or, where appropriate, each employee shall endorse his or her name on a report made by one of the employees.

(c) The misbehavior report shall include the following:

   (1) A written specification of the particulars of the alleged incident of misbehavior involved;

   (2) A reference to the inmate rule book number allegedly violated by the inmate, and a brief description of the rule;

   (3) The date, time, and place of the incident.

   (4) Where more than one inmate was involved in an incident, the report should, to the extent practicable under the given circumstances, indicate the specific role played by each inmate.  Where two or more incidents are involved, all of them may be incorporated into a single misbehavior report.  However, each incident must be separately stated.

(d) All misbehavior reports shall also contain the following language:

   (1) "You are hereby advised that no statement made by you in response to the charge, or information derived therefrom may be used against you in a criminal proceeding."

   (2) "You will be permitted to call witnesses on your behalf provided that so doing does not jeopardize institutional safety or correctional goals."

   (3) "If restricted pending a Hearing for this misbehavior report, you may write to the Deputy Superintendent of Security or designee prior to the Hearing to make a statement on the need for continued prehearing confinement."

   NOTE:  Paragraphs (2) and (3), above, shall not be included in misbehavior reports used in connection with Violation Hearings.

(e) Employees of the Office of Mental Health may write misbehavior reports to the same extent as Department employees.

## Subpart 251-4  Inmate Assistance

## Section 251-4.1  Inmate Assistant.

(a) An inmate shall have the opportunity to pick an employee from an established list of persons who shall assist the inmate when a misbehavior report has been issued against the inmate if:

   (1) The inmate is either illiterate or Limited English Proficient (LEP) (the list of persons who may assist an LEP inmate will only include qualified interpreters); or

   (2) The inmate is sensorially disabled (in which case the inmate will be provided reasonable accommodations including, but not be limited to, the provision of a qualified sign language interpreter for a deaf and hard of hearing inmate who uses sign language to communicate); or

   (3) The inmate is charged with drug use as a result of a urinalysis test; or

   (4) The inmate is confined pending a Superintendent's Hearing to be conducted pursuant to Part 254.

(b) In other cases where a misbehavior report has been issued, the Review Officer or Hearing Officer, in his or her absolute discretion, may offer an inmate the opportunity to pick an Inmate Assistant where such assistance would enable the inmate to adequately comprehend the case in order to respond to the charges.

### 251-4.2  Assistant

The Assistant's role is to speak with the inmate charged, to explain the charges to the inmate, interview witnesses, and to report the results of those efforts to the inmate. He or she may assist the inmate in obtaining documentary evidence or written statements which may be necessary. The Assistant may be required by the Hearing Officer to be present at the Disciplinary or Superintendent's Hearing.

### Subpart 251-5  Timeliness

### Section 251-5.1  Timeliness

(a) Where an inmate is confined pending a Disciplinary Hearing or Superintendent's Hearing, the Hearing must be commenced as soon as is reasonably practicable following the inmate's initial confinement pending said Disciplinary Hearing or Superintendent's Hearing, but, in no event may it be commenced beyond seven days of said confinement without authorization of the Commissioner or designee.

(b) The Disciplinary Hearing or Superintendent's Hearing must be completed within 14 days following the writing of the misbehavior report unless otherwise authorized by the Commissioner or designee. Where a delay is authorized, the record of the Hearing should reflect the reasons for any delay or adjournment, and an inmate should ordinarily be made aware of these reasons unless to do so would jeopardize institutional safety or correctional goals.

(c) Violation Hearings must be completed within seven days of the writing of the misbehavior report.

### Part 252  Violation Hearing

### Section 252.1  Violation Officer

(a) There shall be in each correctional facility one or more Officers of the rank of Sergeant or above who shall function as a Violation Officer, the number to be dependent upon the needs of the facility.

(b) The Violation Officer shall be responsible for conducting the Violation Hearing.

### 252.2      Function of the Violation Hearing.

The purpose of the Violation Hearing shall be to hear and determine allegations of rule violations contained in the misbehavior reports referred for Violation Hearing.

### 252.3      Procedure

(a) Upon receipt of a misbehavior report from the Review Officer, the Violation Officer shall:

(1) Give a copy of the misbehavior report to the inmate at the Violation Hearing;

(2) Allow the inmate to be present at the Violation Hearing, unless he or she refuses to attend; and

(3) Allow the inmate to present documentary evidence, to submit a written statement on his or her behalf, and to reply to the charge. The inmate shall not have the right to call witnesses.

(b) The Violation Officer may allow any evidence necessary to aid in the decision.

### 252.4 Inmates with Limited English Proficiency (LEP)and Sensorially Disabled Inmates.

An inmate with LEP who cannot read and understand English must be given a translated notice of the charges; an inmate with LEP who cannot speak and understand English must be provided with qualified interpretation services for the hearing. A deaf or hard of hearing inmate who uses sign language to communicate shall receive the assistance of a qualified sign language interpreter who shall be present at the Hearing. A hard of hearing inmate who uses an amplifier or other device as a reasonable accommodation must have the opportunity to use such device during the Hearing.

### 252.5 Dispositions at Violation Hearing.

(a) Upon affirming a charge, the Violation Officer may impose any two of the following penalties to be served within a 13-day period. Penalties may be suspended for a period of 13 days:

  (1) Loss of all or part of recreation (game room, day room, television, movies, yard, gym, special events) for up to 13 days;

  (2) Loss of maximum of two of the following privileges; one commissary buy, excluding items related to the inmate's health and sanitary needs, withholding of radio for up to 13 days, withholding of packages for up to 13 days, excluding perishables that cannot be returned;

  (3) The imposition of one work task per day, other than a regular work assignment for a maximum of seven days, excluding Sundays and public holidays, to be performed on the inmate's housing unit, or other designated area. Inmates given such disposition, who are participating in a regular work assignment, shall not be required to work more than eight hours per day. The eight-hour limitation excludes such non-work assignments as educational or vocational school programming; and

  (4) Counsel and/or reprimand.

(b) Following the Violation Hearing, the inmate shall receive a written statement indicating the penalty imposed as soon as possible, but not later than 24 hours after the conclusion of the Hearing.

(c) Records of disposition of Violation Hearings shall not be used for any purpose, except as follows:

  (1) A Violation Officer shall have available records of an inmate's suspended and uncompleted dispositions when conducting a Hearing with regard to the inmate; and

  (2) In determining the appropriate level at which an inmate's misbehavior report should be handled, a Review Officer may consider descriptions of an inmate's charges and dispositions of Violation Hearings dated within 14 days of the review.

(d) All misbehavior reports for Violation Hearings are to be destroyed 14 days after the Hearing is held. Dispositions for Violation Hearings shall not be made part of any inmate's institutional records.

### 252.6 Appeal Procedures.

Appeals must be submitted within 24 hours of receipt of the violation disposition to the Superintendent or designee. A decision shall be issued within seven days of receipt of the appeal.

### 252.7 Discretionary Review by Superintendent.

At any time during which a penalty imposed pursuant to a Violation Hearing is in effect, the Superintendent may reduce the penalty.

## Part 253  Disciplinary Hearing

### Section 253.1  Establishment of the Disciplinary Hearing Officer.

(a) There shall be at each correctional facility one or more Hearing Officers of the rank of Lieutenant or above who shall function as a Disciplinary Hearing Officer, the number to be dependent upon the needs of the facility.  The Superintendent may, in his or her discretion, designate some other employee to conduct Disciplinary Hearings.

(b) The Disciplinary Hearing Officer shall be responsible for conducting Disciplinary Hearings in an impartial manner.  No person who has participated in any investigation of the acts shall be a Hearing Officer at a Hearing relating to those acts, nor shall any person who has prepared or caused to be prepared the misbehavior report on which a Hearing is held, act as the Hearing Officer on that charge.

### 253.2  Inmates with LEP and sensorially disabled inmates.

An inmate with LEP who cannot read and understand English must be given a translated notice of the charges and statements of evidence relied upon and reasons for actions taken; an inmate with LEP who cannot speak and understand English must be provided with qualified interpretation services for the hearing.  A deaf or hard of hearing inmate who uses sign language to communicate shall receive the assistance of a qualified sign language interpreter who shall be present at the Hearing.  A hard of hearing inmate who uses an amplifier or other device as a reasonable accommodation must have the opportunity to use such device during the Hearing.

### 253.3  Formal Charge.

The formal charge shall consist of the misbehavior report which shall be prepared in accordance with the provisions of Section 251-3.1 of this Chapter.

### 253.4  Assistance

The inmate shall be provided with an Assistant in accordance with the provisions of Subpart 251-4 of this Chapter.

### 253.5  Inmate Witnesses.

(a) The inmate may call witnesses on his or her behalf provided their testimony is material, is not redundant, and doing so does not jeopardize institutional safety or correctional goals.  If permission to call a witness is denied, the Hearing Officer shall give the inmate a written statement stating the reasons for the denial, including the specific threat to institutional safety or correctional goals presented.

(b) Any witness shall be allowed to testify at the Hearing in the presence of the inmate unless the Hearing Officer determines that so doing will jeopardize institutional safety or correctional goals.  Where an inmate is not permitted to have a witness present, such witness may be interviewed out of the presence of the inmate and such interview tape recorded.  The recording of the witness' statement is to be made available to the inmate at the Hearing unless the Hearing Officer determines that so doing would jeopardize institutional safety or correctional goals.

(c) An inmate may request a witness by either:

(1) Informing his or her Assistant or the Hearing Officer before the Hearing; or

(2) Informing the Hearing Officer during the Hearing.

### 253.6  Method of determination.

Upon receipt of a misbehavior report from the Review Officer, the Hearing Officer shall commence the Disciplinary Hearing as follows:

(a) The misbehavior report shall be served on the inmate at least 24 hours before the Disciplinary Hearing.  If the inmate is confined and requests an Assistant, the Hearing may not be held until 24 hours after the Assistant meets with the inmate.

(b) The inmate shall be present at the Hearing unless he or she refuses to attend, or is excluded for reason of institutional safety or correctional goals.  The entire Hearing must be electronically recorded.

(c) The inmate, when present, may reply orally to the charge and/or evidence and shall be allowed to submit relevant documentary evidence or written statements on his or her behalf.

### 253.7  Dispositions and Mandatory Surcharge

(a) Dispositions:

(1) Upon affirming a charge, the Hearing Officer may impose one or more of the following penalties:

(i) Counsel and/or reprimand;

(ii) Loss of one or more specified privileges, for a period of up to 30 days. Correspondence privileges may not be withheld; however, visiting privileges may be withheld with a particular person where the inmate has been involved in improper conduct in connection with visitation with such person.  Visiting-related sanctions shall be imposed only in accordance with the provisions of the penalty chart contained in Appendix A of Directive #4403, "Inmate Visitor Program;"

(iii) Confinement to a cell or room continuously or to a special housing unit under keeplock admission or on certain days during certain hours for a period of up to 30 days (see Directive #4933, Section III-E);

(iv) Restitution for loss or intentional damage to property up to $100; or

(v) The imposition of one work task per day, other than a regular work assignment for a maximum of seven days, excluding Sundays and public holidays, to be performed on the inmate's housing unit, or other designated area.  Inmates given such disposition who are participating in a regular work assignment shall not be required to work more than eight hours per day.  The eight-hour limitation excludes such non-work assignments as educational or vocational school programming.

(2) Any penalty imposed pursuant to this section shall run consecutively to any other like penalty previously imposed unless the Hearing Officer advised the inmate that the penalty shall run concurrently.

(3) Whenever a confinement penalty is being served and a more restrictive confinement penalty is imposed as a result of another Hearing, the more restrictive penalty shall begin to be served immediately, and any time owed on the less restrictive penalty shall be served after completion of the more restrictive penalty period.

(4) The Disciplinary Hearing Officer may suspend imposition of any penalty for a period of up to 90 days.  Any such suspended penalty may be imposed by a subsequent Disciplinary Hearing or Superintendent's Hearing Officer upon substantiating a charge of misbehavior in a subsequent Hearing within a specific period.

Case 9:19-cv-00057-BKS-ATB   Document 1-11   Filed 01/16/19   Page 18 of 48

(5) As soon as possible, but no later than 24 hours after the conclusion of the Hearing, the inmate shall be given a written statement of the disposition of the Hearing. This statement shall set forth the evidence relied upon by the Hearing Officer in reaching his or her decision and also set forth the reasons for any penalties imposed.

(b) Mandatory disciplinary surcharge. Upon the conclusion of a Disciplinary Hearing wherein the inmate admits the charges, or where the Hearing Officer affirms one or more of the charges, a mandatory disciplinary surcharge in the amount of five dollars ($5.00) shall be assessed automatically against the inmate.

## 253.8 Appeal Procedures.

The inmate shall be advised of his or her right to appeal the disposition of the Disciplinary Hearing to the facility Superintendent. Such appeal shall be submitted in writing to the Superintendent within 72 hours of the receipt of the disposition. The Superintendent or designee shall issue a decision within 15 days of receipt of the appeal.

## 253.9 Discretionary Review by Superintendent.

At any time during which a penalty imposed pursuant to a Disciplinary Hearing is in effect, the Superintendent may reduce the penalty.

## Part 254  Superintendent's Hearing

### Section 254.1  Hearing Officer

The person appointed to conduct the Superintendent's Hearing shall be either the Superintendent, a Deputy Superintendent, Captain, or Commissioner's Hearing Officer employed by the Department's Central Office, but the Superintendent may, in his or her discretion, designate some other employee to conduct the proceeding. The following persons shall not be appointed to conduct the proceeding: a person who actually witnessed the incident; a person who was directly involved in the incident; the Review Officer who reviewed the misbehavior report; a person who has investigated the incident.

### 254.2  Inmates with LEP and Sensorially Disabled Inmates.

An inmate with LEP who cannot read and understand English must be given a translated notice of the charges and statements of evidence relied upon and reasons for actions taken; an inmate with LEP who cannot speak and understand English must be provided with qualified interpretation services for the hearing. A deaf or hard of hearing inmate who uses sign language to communicate shall receive the assistance of a qualified sign language interpreter who shall be present at the Hearing. A hard of hearing inmate who uses an amplifier or other device as a reasonable accommodation must have the opportunity to use such device during the Hearing.

### 254.3  Formal Charge.

The formal charge shall consist of the misbehavior report which shall be prepared in accordance with the provisions of Section 251-3.1 of Subpart 251-3 of this Subchapter.

### 254.4  Notice and assistance.

The inmate shall be provided with an assistant in accordance with the provisions of Subpart 251-4 of this Subchapter.

### 254.5  Inmate witnesses.

(a) The inmate may call witnesses on his or her behalf provided their testimony is material, is not redundant, and doing so does not jeopardize institutional safety or correctional goals. If permission to call a witness is denied, the Hearing Officer shall give the inmate a written statement stating the reasons for the denial, including the specific threat to institutional safety or correctional goals presented.

(b ) Any witness shall be allowed to testify at the Hearing in the presence of the inmate unless the Hearing Officer determines that so doing will jeopardize institutional safety or correctional goals.  Where an inmate is not permitted to have a witness present, such witness may be interviewed out of the presence of the inmate and such interview tape recorded.  The recording of the witness' statement is to be made available to the inmate at the Hearing unless the Hearing Officer determines that so doing would jeopardize institutional safety or correctional goals.

(c )An inmate may request a witness by either:

(1) Informing his or her Assistant or the Hearing Officer before the Hearing; or

(2) Informing the Hearing Officer during the Hearing.

### 254.6  Method of determination.

(a) Generally.  Upon receipt of a misbehavior report from the Review Officer, the Hearing Officer shall commence the Superintendent's Hearing as follows:

(1) The misbehavior report shall be served on the inmate at least 24 hours before the Superintendent's Hearing. If the inmate is confined and requests an Assistant, the Hearing may not start until 24 hours after the Assistant's initial meeting with the inmate.

(2) The inmate shall be present at the Hearing unless he or she refuses to attend, or is excluded for reasons of institutional safety or correctional goals. The entire Hearing must be electronically recorded.

(3) The inmate when present may reply orally to the charge and/or evidence and shall be allowed to submit relevant documentary evidence or written statements on his or her behalf.

(4) When applicable, the information identified in subparagraphs (b)(1)(i)(iv)(v) and (b)(2)(i)(ii) of this Section, derived from the Department's electronic databases, shall automatically appear on a computer generated hearing record sheet that shall be provided to the Hearing Officer for use at the Hearing.

(b) Mental state or intellectual capacity.  When an inmate's mental state or intellectual capacity is at issue, a Hearing Officer shall consider evidence regarding the inmate's mental condition or intellectual capacity at the time of the incident and at the time of the Hearing in accordance with this Section.

(1) For the purposes of this Section, an inmate's mental state shall be deemed at issue when:

(i) The inmate is classified as level 1 by the Office of Mental Health (OMH), as indicated on the Hearing record sheet;

(ii) The inmate is charged with engaging in an act of self-harm in violation of rule 123.10 (item 270.2(B)(23)(i) of Title 7), as indicated on the misbehavior report;

(iii) The incident occurred while the inmate was being transported to or from the Central New York Psychiatric Center (CNYPC), as alleged in the misbehavior report;

(iv) The inmate was an inpatient at the CNYPC within nine months prior to the incident, as indicated on the Hearing record sheet;

(v) The incident occurred while the inmate was assigned to an OMH satellite unit or intermediate care program, as indicated on the Hearing record sheet;

(vi) The incident occurred while the inmate was being escorted to or from an OMH satellite unit or intermediate care program, as alleged in the misbehavior report;

(vii) The Hearing was delayed or adjourned, after an extension of time was obtained in accordance with Section 251-5.1 of this Chapter, because the inmate became an inpatient at the CNYPC or was assigned to the OMH satellite unit; or

(viii) It appears to the Hearing Officer, based on the inmate's testimony, demeanor, the circumstances of the alleged offense, or any other reason, that the inmate may have been mentally impaired at the time of the incident or may be mentally impaired at the time of the Hearing.

(2) For the purposes of this Section an inmate's intellectual capacity shall be deemed at issue when:

(i) The incident occurred while the inmate was assigned to the Special Needs Unit (SNU) at Wende or Sullivan Correctional Facilities, as indicated on the Hearing record sheet;

(ii) The inmate has not scored above a sixty-nine (69) on any intelligence testing instrument administered to the inmate by the Department and has not scored above a 3.0 grade level in any reading comprehension testing instrument administered to the inmate by the Department, as indicated on the Hearing record sheet; or

(iii) It appears to the Hearing Officer, based on the inmate's testimony, demeanor, the circumstances of the alleged offense, or any other reason, that the inmate may have been intellectually impaired at the time of the incident or may be intellectually impaired at the time of the Hearing.

(c) When an inmate's mental state or intellectual capacity is at issue, pursuant to subdivision (b) above, the Hearing Officer shall:

(1) Ask the inmate whether he or she understands the disciplinary charge, the purpose of the Hearing and the role of the participants in the Hearing;

(2) Inquire of other witnesses to the incident, as may be called in accordance with Section 254.5 of this Part, concerning any observations that they may have regarding the inmate's mental condition or intellectual capacity at the time of the incident; and

(3) Where an inmate's mental state is at issue, out of the presence of the inmate and on a confidential tape, interview an OMH clinician as may be available concerning the inmate's mental condition at the time of the incident and the time of Hearing; or

(4) Where an inmate's intellectual capacity is at issue, out of the presence of the inmate and on a confidential tape, interview a Offender Rehabilitation Coordinator or Teacher as may be available concerning the inmate's intellectual capacity at the time of the incident and the time of the Hearing.

(d) If it is determined that the inmate is unable to participate in the Hearing process because the inmate does not understand the disciplinary charge, the purpose of the Hearing and the role of the participants in the Hearing, the Hearing shall be adjourned until such time as the inmate is able to participate in the Hearing process and, if necessary, a request for a time extension shall be made in accordance with Section 251-5.1 of this Chapter.

(e) If it is determined that the inmate is able to participate in the Hearing process but is in need of assistance, the Hearing shall be adjourned and the inmate shall be offered an Assistant in accordance with Section 251-4.1 of this Chapter.  Pursuant to Section 251-4.2 of this Chapter, the Assistant may be required by the Hearing Officer to be present at the Hearing.

(f) If it is determined that the inmate is capable of proceeding with the Hearing and a finding of guilt is subsequently made with regard to one or more of the charges, the Hearing Officer shall consider the inmate's mental condition or intellectual capacity at the time of the incident, if at issue in accordance with paragraphs (b)(1) or (2) above, respectively, in determining the appropriate penalty to be imposed under Section 254.7 of this Part. In addition, if in light of the inmate's mental condition or intellectual capacity, the Hearing Officer believes that a penalty with regard to one or more of the charges would serve no useful purpose, the Hearing Officer may dismiss the charge or charges altogether. The written statement of the disposition of the charges, if any, shall, in accordance with Section 254.7(a)(5) of this Part, reflect how the inmate's mental condition or intellectual capacity was considered.

(g) A copy of a written statement of the disposition of the charges issued in accordance with subdivision (f) above shall, if the disposition includes confinement to SHU and the inmate is housed in a correctional facility designated by OMH as level 1 or 2, be provided to the OMH unit at the facility for use in connection with any mental health assessments.  In a correctional facility designated by OMH as level 1, the inmate's status shall also be the subject of the next scheduled meeting of the facility's Special Housing Unit Case Management Committee in accordance with Part 310 of Title 7.

## 254.7  Dispositions and Mandatory Surcharge

(a) Dispositions:

(1) Where the inmate admits the charges, or where the Hearing Officer affirms the charges on the basis of the evidence, the Hearing Officer may impose one or more of the following penalties:

(i) Counsel and/or reprimand;

(ii) Loss of one or more specified privileges, for a specified period. Correspondence and/or visiting privileges may be withheld with a particular person where the inmate has been involved in improper conduct in connection with correspondence and/or visitation with such person.  Visiting-related sanctions shall be imposed only in accordance with the provisions of the penalty chart contained in Appendix A of Directive #4403, "Inmate Visitor Program;"

(iii) Confinement to a cell or room continuously or to a special housing unit continuously or on certain days during certain hours for a specified period;

(iv) Confinement as authorized under subparagraph (iii) of this subdivision, but on a restricted diet administered in accordance with the provisions of Directive #4933, Section 304.2;

(v) Restitution for loss or intentional damage to property to be made from an inmate's existing and future funds;

(vi) Forfeiture of money confiscated as contraband;

(vii) Loss of a specified period of good behavior allowance ("good time"), subject to restoration as provided in Subchapter B of this directive;

(vii) The imposition of one work task per day, other than a regular work assignment for a maximum of seven days, excluding Sundays and public holidays, to be performed on the inmate's housing unit, or other designated area. Inmates given such disposition who are participating in a regular work assignment shall not be required to work more than eight hours per day. The eight-hour limitation excludes such non-work assignments as educational or vocational school programming; or

(ix) Where applicable, removal from the elected Inmate Grievance Resolution Committee (IGRC) and/or loss of the privilege of participating as a voting member of the IGRC for a specified period of time.

(2) Any penalty imposed pursuant to this Section shall run consecutively to any other like penalty previously imposed unless the Hearing Officer advised the inmate that the penalty shall run concurrently.

(3) Whenever a confinement penalty is being served and a more restrictive confinement penalty is imposed as a result of another Hearing, the more restrictive penalty shall begin to be served immediately, and any time owed on the less restrictive penalty shall be served after completion of the more restrictive penalty period.

(4) The Hearing Officer may suspend imposition of any penalty for a period of up to 180 days. Any such suspended penalty may be imposed by a subsequent Disciplinary Hearing or Superintendent's Hearing Officer upon substantiating a charge of misbehavior or in a subsequent Hearing within a specific period.

(5) As soon as possible, but no later than 24 hours after the conclusion of the Hearing, the inmate shall be given a written statement of the disposition of the Hearing. This statement shall set forth the evidence relied upon by the Hearing Officer in reaching his or her decision and also set forth the reasons for any penalties imposed and, if applicable, pursuant to Section 254.6(b) of this Part, reflect how the inmate's mental condition or intellectual capacity was considered.

(b) Mandatory disciplinary surcharge. Upon the conclusion of a Superintendent's Hearing wherein the inmate admits the charges, or where the Hearing Officer affirms one or more of the charges, a mandatory disciplinary surcharge in the amount of five dollars ($5.00) shall be assessed automatically against the inmate.

## 254.8 Appeal Procedures.

Any inmate shall have the right to appeal the disposition of any Superintendent's Hearing to which he or she was a party, to the Commissioner within 30 days of receipt of the disposition. The Commissioner or designee shall issue a decision within 60 days of receipt of the appeal. The Commissioner or designee may:

(a) Affirm the Hearing disposition;

(b) Modify the Hearing disposition by dismissing certain charge(s) and/or reducing the penalty imposed;

(c) Reverse the Hearing disposition; or

(d) Reverse the Hearing disposition and order a new Hearing.  Whenever a new Hearing is ordered pursuant to this subdivision, the penalty imposed at the new Hearing may not exceed the penalty imposed at the original Hearing.

## 254.9  Discretionary Review by Superintendent.

At any time during which a penalty imposed pursuant to a Superintendent's Hearing is in effect, the Superintendent may reduce the penalty.

## SUBCHAPTER B    PROCEDURES FOR GRANTING GOOD BEHAVIOR ALLOWANCES

Part 260    General Provisions
Part 261    Time Allowance Committees
Part 262    Granting of Time Allowances
Part 263    Stay of Good Behavior Allowance

## Part 260  General Provisions

### Section 260.1  Application of Good Behavior Allowances.

(a) The opportunity to earn good behavior allowances offers inmates a tangible reward for positive efforts made during incarceration.

(b) For those inmates serving indeterminate sentences imposed for crimes committed prior to September 1, 1967, good behavior allowances shorten the amount of time to be served prior to parole consideration.

(c) For all inmates serving determinate or indeterminate sentences (other than life sentences) who are not granted parole or a reparole, but who nevertheless have performed well within the correctional facilities, good behavior allowances can be used to obtain release under supervision and to demonstrate prior to expiration of the term of the sentence that they can follow acceptable behavior patterns in the community as well as in a correctional facility.

## 260.2  Nature of Allowances.

Good behavior allowances are in the nature of a privilege to be earned by the inmate and no inmate has the right to demand or to require that any good behavior allowance be granted.

## 260.3  Criteria for Allowances.

(a) All recommendations and decisions must be made through completely impersonal, impartial and fair and reasonable evaluations.

(b) In evaluating the amount of allowance to be granted, the statutory criteria (i.e., good behavior, efficient and willing performance of duties assigned, progress and achievement in an assigned treatment program) shall be viewed in the light of the following factors:

(1) The attitude of the inmate;

(2) The capacity of the inmate; and

(3) The efforts made by the inmate within the limits of his or her capacity.

## 260.4  Forfeitures and Disallowances.

(a) An inmate shall not automatically forfeit or automatically be disallowed any good behavior allowance by reason of the fact that he or she has been confined to a cell or room or in a special housing unit for a period of time.

(b) A disposition involving loss of a specified period of good behavior allowance made in a Superintendent's Hearing under Part 254 of this directive shall be deemed to be tentative until such time as it actually affects consideration for parole or for conditional or other release, and shall then either be confirmed or be modified by the Commissioner or designee.

## Part 261   Time Allowance Committees

### Section 261.1  Establishment of Time Allowance Committees.

(a) There shall be in each correctional facility a committee to be known as the Time Allowance Committee.

(b) Such Committee shall consist of at least three members designated by the Superintendent. The Superintendent shall appoint one of the members as Chairman. The members shall be selected from a list of eight employees preselected by the Superintendent and filed with the Commissioner. The list of names filed by the Superintendent shall be deemed approved by the Commissioner unless and until the Commissioner removes an individual from the list in writing.

(c) Each such Committee shall have a Chairman designated by the Superintendent from among the members and the Chairman shall be responsible for the proper operation of the Committee.

### 261.2  Role of Time Allowance Committees.

The purpose of the Time Allowance Committee shall be to make recommendations as to the amount of good behavior allowance to be granted to inmates who are eligible to be considered for such allowance.

### 261.3  Procedure of Time Allowance Committees.

(a) For inmates entitled to be considered for good behavior allowances, the file of each such inmate shall be considered in the fourth month preceding the month of the earliest possible date he or she would be entitled to consideration for release if that date depends on the amount of good behavior allowance to be granted.

(b) The Committee shall consider the entire file of the inmate, and then shall decide upon a recommendation as to the amount of good behavior allowance to be granted, applying the principles set forth in Sections 260.3 and 260.4 of this directive. At such meetings, conducted in accordance with subdivision (a) of this Section, any inmate who has had a recommended loss of good behavior allowance from a Superintendent's Hearing shall appear before the Committee. The Committee shall consider whether, and set forth its recommendation as to whether, the inmate's subsequent behavior merits restoration of all or part of the lost allowance and its reasons therefor.

(c) The Committee shall not recommend the granting of the total allowance authorized by law or the withholding of any part of the allowance in accordance with any automatic rule, but shall appraise the entire institutional experience of the inmate and make its own determination.

(d) The Committee shall promptly report the results of its deliberations in writing to the Superintendent. Such report shall set forth its recommendation for the time to be allowed for the period under consideration and the reasons for the recommendation.

(e) All recommendations of the Committee shall be pursuant to a decision of a majority of the members, but any member who disagrees shall note his or her recommendations and the reasons therefor on the report of the Committee. Where a majority of the members are unable to agree upon a recommendation, the Chairman shall report such fact and each member shall report his or her recommendation and reasons in the report made by the Chairman.

(f) Where the Time Allowance Committee has recommended an allowance which will extend the period of incarceration beyond the earliest or any previously established release date, the inmate may be scheduled to reappear before another Time Allowance Committee in accordance with the direction of the Commissioner, Superintendent or Committee Chairperson.

## 261.4  Time Allowance Hearing.

(a) Where the Committee has determined that there may be sufficient reason present after a review of the file not to recommend the granting of the total allowance authorized, other than time lost as the result of a Superintendent's Hearing, or upon direction of the Superintendent pursuant to subdivision (b) of Section 263.2, the Committee shall schedule a Time Allowance Committee Hearing to be held for the purpose of determining if sufficient reason is present not to recommend the granting of the total allowance authorized and to determine the amount of time to be recommended for allowance and the reasons for the recommendation.

(b) At least 48 hours prior to the Time Allowance Hearing and for the purposes stated in subdivision (a) of this Section, the Chairman shall designate an employee to file and deliver to the inmate a formal notice of such Hearing. The formal notice shall contain a written specification of the particulars that caused the Time Allowance Committee to believe that there may be sufficient reason not to grant the total allowance authorized.

(c) The Chairman of the Time Allowance Committee shall designate an employee to furnish assistance to the inmate. Such employee shall be of the inmate's choice selected from a list established by the Superintendent or any other employee upon approval of the Superintendent.

(d) Such employee shall explain the nature of the Hearing and the particulars specified in the formal notice. The employee also shall ask the inmate whether there is any factual matter that can be presented in his or her behalf and shall investigate any reasonable factual claim that the inmate may make.

(e) A written report of the action taken and the results of the investigation, if any, including documentary evidence and witness statements shall be delivered to the Chairman of the Time Allowance Committee prior to the commencement of the special meeting.

(f) The Time Allowance Committee shall reconsider the entire file of the inmate, shall interview the inmate, shall consider any factual matter brought to its attention by the inmate or the person designated to provide assistance to the inmate, and may in the Committee's discretion interview any person who may have information relevant to the Hearing.

(g) The Time Allowance Committee shall advise the inmate of any factual circumstances that appear to support a determination not to recommend the granting of the total time allowance authorized, and shall afford the inmate the opportunity to comment thereon and to make any statement he or she may care to submit in respect to his or her time allowance.

(h) Where the Time Allowance Committee is satisfied, after Hearing the inmate, that the record of the proceeding contains substantial evidence in support of a determination not to grant the total allowance authorized, they shall set the amount of time they will recommend to be withheld and shall so advise the Superintendent as provided for in Section 261.3(d) of this Part.

(i) In any case where the Time Allowance Committee is not satisfied, after considering all available evidence, that the record of the proceeding contained substantial evidence to support the determination not to grant the total allowance authorized, they shall recommend the granting of a total allowance authorized and shall so advise the Superintendent as provided for in Section 261.3(d) of this Part.

(j) A written report, including a statement of the reasons for the recommendation, shall be provided to the inmate following review by the Superintendent and by the Commissioner or designee.

## Part 262  Granting of Time Allowances

### Section 262.1  Procedure for Granting Good Behavior Allowances.

(a) After consideration of the file by the Committee, and after fulfilling any other requirements set forth in this subchapter, the Committee shall make a recommendation to the Superintendent as to the amount of good behavior allowance to be accorded to the inmate.

(b) The Superintendent shall promptly review the report of the Committee and shall endorse any comments he or she may deem appropriate thereon and immediately forward the report of the Committee and comments, if any, to the Commissioner or designee.

(c) The Commissioner or designee will then transmit to the Superintendent an order either confirming or modifying the amount of time to be granted, or remand the matter back to committee for re-evaluation and a Hearing in accordance with Section 261.4

(d) The time allowance specified in the final order of the Commissioner or designee shall be the good behavior allowance to be granted to the inmate.  The grant of the good behavior allowance shall be contingent on the inmate's continued good behavior, efficient and willing performance of duties assigned, and progress and achievement in an assigned treatment program.  The inmate shall be given a copy of this determination promptly.

## Part 263  Stay of Good Behavior

### Section 263.1  Stay of Good Behavior Allowance.

Between the time a decision has been made with respect to good behavior allowance and the time that an inmate would be eligible for parole consideration or for conditional or other release, the award of any good behavior allowance that has been granted shall be stayed and such allowance shall be suspended as provided by Section 263.2 of this Part.

### 263.2      Procedure for Stay of Good Behavior Allowance.

(a) *Superintendent's Hearing.*

(1) The decision directing that a misbehavior report be heard in a Superintendent's Hearing against an inmate shall stay the award of any good behavior allowance that has been granted such inmate, and such allowance shall be suspended and of no force and effect until a final decision has been made in the Superintendent's Hearing.

(2) At the conclusion of the Hearing, if the disposition does not involve loss of good behavior allowance, the allowance previously granted shall be reinstated.

(3) Where the disposition does involve loss of good behavior allowance, and the inmate has an approved conditional release date earlier than his or her maximum expiration date, the disposition shall automatically be reviewed by the Commissioner or designee.

(4) If the Hearing decision is affirmed, the recommended loss of good behavior allowance shall be applied to the inmate's conditional release date. Any modification or other decision rendered by the Commissioner or designee shall be applied as specified in such decision. The inmate shall be given a copy of this determination promptly.

(b) *Disregard for statutory criteria.*

(1) If an inmate who has been granted a good behavior allowance subsequently acts in disregard of the statutory criteria for good behavior allowances (i.e., good behavior, efficient and willing performance of duties assigned, and progress and achievement in an assigned treatment program), the Superintendent may direct the Time Allowance Committee to conduct a Hearing in accordance with Section 261.4 of this Chapter to reconsider the amount of good time to be granted.

(2) The provisions of Part 262 and 263 shall apply after any Hearing conducted pursuant to this subdivision.

Exhibit
T

FOLD HERE

**EVIDENCE/PROPERTY**

Agency_____   Case No. _MM-0060_

Item No._____   Date _____

Suspect _Agre_____

Victim _____

Date and Time of Recovery _2-28 Copper Blvd_

Recovered By _____

Description and/or Location _found on_

_Person_ _____

_/in Weapon_ _____

_Right front_ _____

**CHAIN OF CUSTODY**

| FROM | TO | DATE |
|------|-----|------|
| CO K _____ | _____ | _____ |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

**TO USE:**
1) Remove Release Liner from Flap
2) Fold Where Indicated. BAG IS NOW SEALED
3) Tear Where Indicated Along Perforated Record

CAUTION: ATTEMPTS TO REOPEN WILL DISTORT SEALED AREA

Condition of Bag When Opened   Blocked

OPENED BY _____

**SIRCHIE** _____

100 Hunter Place, Youngsville ___USA

Phone (919) _____

Fax (919) _____

TO REMOVE         CUT ALONG BOTTOM



Exhibit

"U"



**NEW YORK**
**Corrections and**
**Community Supervision**

ANDREW M. CUOMO
Governor

ANTHONY J. ANNUCCI
Acting Commissioner

## MEMORANDUM

To:       LT. T. Quinn

From:     SGT. R VAN FleeT

Subject:  UI. 16-0060

Date:     2-28-16

— During Keeplock Rec., Officer K. Vincent was Wanding Inmate Agee, I. #08B1474 D7-27 w̄ the hand Held Metal Detector, The wand Sounded @ Inmate Agee's waiste Band on his RighT Side. Officer K. Vincent Recovered a Razor Type Weapon w̄ A Black Sheath & Black Tape Handle. Weapon was recovered from Inmate Agee's Waiste Band on his pants from the Right Side. Weapon Appears to be a STATE issued Razor, Weapon Measured 2" x Yi" W̄ A Black Tape Sheath and Handle. No Further Contraband Found on Frisk. — All proper paper Work Filledout and Filed, P.C. Warden Signed, Urine Request Submitted, Photo of Weapon taken, Misbehavior Report Written. Cell Frisk produced No Further Contraband. Weapon Placed in Evidence Locker Per Directive 4910A. NOTE: NO STATE Razor was Found in Cell during Cell Frisk further Investigation Shows That Said Inmate has Razor exempt Permit. Cell was packed and Sent to SHU-D. Inmate escorted to SHU-D w̄out Incident.

Respectfully submitted,

*Sgt Van Fleet*

 **NEW YORK STATE** | **Corrections and Community Supervision**

ANDREW M. CUOMO
Governor

ANTHONY J. ANNUCCI
Acting Commissioner

To:        DSS E. Fagan

From:      Lt. M. Ouimette Acting Captain

Subject:   Unusual Incident 16-0060 Razor Blade

Date:      February 29, 2016

EVENTS CAUSING:

On 2/28/16, Inmate Agee 08B1474 had a razor blade type weapon concealed in the waistband of his pants, as he was about to go to keeplock recreation.

Respectfully submitted,

*Michael Ouimette Lt.*

Michael Ouimette Lieutenant



**Corrections and Community Supervision**

ANDREW M. CUOMO
Governor

ANTHONY J. ANNUCCI
Acting Commissioner

To:       DSS E. Fagan

From:    Lt. M. Ouimette Acting Captain

Subject:  Unusual Incident 16-0060 Razor Blade

Date:     February 29, 2016

EVENTS CAUSING:

On 2/28/16, Inmate Agee 08B1474 had a razor blade type weapon concealed in the waistband of his pants, as he was about to go to keeplock recreation.

Respectfully submitted,

*Michael Ouimette Lt.*

Michael Ouimette Lieutenant

FORM 2062          STATE OF NEW YORK -- DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION
(REV. 05/12)                              REQUEST FOR URINALYSIS

FACILITY _Auburn CF_____ Test # _____
INMATE NAME _AGEE, J._____ NUMBER _08B1474_ CELL _(D7-27)_
REQUEST MADE BY _Sgt. R. Von Fleet_____ DATE _2-28-16_

AGENT(S) SUSPECTED (IF ANY)
_All controlled Substances_____
CIRCUMSTANCES LEADING TO REQUEST _found weapon on Person_____
_____

TEST APPROVED BY: _____ DATE _2/28/16_

INMATE TOLD THE UNDERLYING REASON WHY HE IS BEING ORDERED TO SUBMIT A URINE SPECIMEN CIRCLE ONE:
SUSPICION, ROUTINE, RANDOM)

BY _____ DATE _____ TIME _____
HAS INMATE TAKEN MEDICATION RECENTLY? (YES OR NO) SPECIFY _____
_____

INMATE ORDERED TO SUBMIT SPECIMEN:                          DATE _____ TIME _____
SPECIMEN WITNESSED AND OBTAINED BY _____ DATE _____ TIME _____
DOES INMATE WILLFULLY REFUSE TO SUBMIT SPECIMEN? (YES OR NO)
DOES INMATE CLAIM TO BE UNABLE TO SUBMIT SPECIMEN IN THE PRESENCE OF OTHERS?
                                        (YES OR NO) _ DATE _____ TIME _____
*(In the event an inmate makes this claim, the procedures in Directive #4937, section IV-E shall be followed).

IF INMATE CLAIMS TO BE UNABLE TO SUBMIT SPECIMEN, HAS INMATE BEEN GIVEN AT LEAST THREE HOURS TO
SUBMIT SPECIMEN? (YES OR NO)
SPECIMEN TESTED BY (1ST TEST) _____ DATE _____ TIME _____
RESULTS _____
SPECIMEN TESTED BY (2ND TEST) _____ DATE _____ TIME _____
RESULTS _____

CHAIN OF CUSTODY (STARTING WITH STAFF OBTAINING SPECIMEN, ATTACH ADDITIONAL PAGES IF NECESSARY)

FROM _____ TO _____ DATE _____ TIME _____
FROM _____ TO _____ DATE _____ TIME _____
FROM _____ TO _____ DATE _____ TIME _____
FROM _____ TO _____ DATE _____ TIME _____
FROM _____ TO _____ DATE _____ TIME _____
FROM _____ TO _____ DATE _____ TIME _____
FROM _____ TO _____ DATE _____ TIME _____
FROM _____ TO _____ DATE _____ TIME _____
FROM _____ TO _____ DATE _____ TIME _____

This form is to be filled out COMPLETELY.  It is to accompany the specimen until the specimen is tested.
If the specimen is positive, a MISBEHAVIOR REPORT shall be written.

| NEW YORK STATE **Corrections and Community Supervision** **DIRECTIVE** | TITLE **Contraband Drug Testing** | | NO. 4938 |
|---|---|---|---|
| | | | DATE 2/11/2016 |
| SUPERSEDES DIR #4938 Dtd. 9/23/2009 | DISTRIBUTION A B | PAGES PAGE 1 OF 10 | DATE LAST REVISED |
| REFERENCES (Include but are not limited to) 7NYCRR Part 1010 Directive #4004, Directive #4910A | APPROVING AUTHORITY *Joseph F. Bellne* | | |

**§ 1010.1 POLICY**: An attempt shall be made to identify any substances which are found and suspected of being contraband drugs.

**§ 1010.2 DESCRIPTION**: This directive outlines the procedures to be followed by each facility in the testing of suspected contraband drugs. The Department currently utilizes two testing systems, the Safariland NIK® poly testing system, and the Sirchie NARK® II drug testing system.

**§ 1010.3 BACKGROUND**: The possession by anyone of contraband drugs presents a serious threat to the safety and security of a correctional facility. The importation of and trafficking in contraband drugs provides an opportunity for the demoralization of inmates and the corruption of correctional staff. The accurate identification of suspected contraband drugs and the use of appropriate disciplinary sanctions for the possession of contraband drugs can assist facility administrators in detecting and suppressing this threat.

**§ 1010.4 PROCEDURE**: When a substance is found which is suspected of being a contraband drug the following steps shall be taken:

    (a)   Place the substance in a sealed container and label it with the following information:

        (1)   Date and time found;

        (2)   Place where found; and

        (3)   Name and badge number of the Officer, Security Supervisor, or Executive Team member with Peace Officer status or name and title of the employee (if civilian) finding the substance.

    (b)   Initiate a "Request for Test of Suspected Contraband Drugs" (see Section 1010.8(a), Attachment A, Form #2080) to include details of "Circumstances Leading to Request." Each person handling the suspected substance shall make an appropriate notation on the form to document the action taken as well as the chain of custody of the substance until it is identified or, if applicable, placed in control of the Office of Special Investigations' Narcotics staff or a police agency or State Police Laboratory.

    (c)   If the substance is not to be identified immediately, it shall be stored in a secure evidence drop box or the secure evidence locker in accordance with Directive #4910A, "Contraband/Evidence – Handling, Storage, and Disposition."

    (d)   The substance shall be inspected at the facility pharmacy for possible identification, or if appropriate pharmacy staff are not available, with the assistance of nursing staff.

| Attachment A | | NO. **4938, Contraband Drug Testing** |
|---|---|---|
| | DATE  2/11/2016 | PAGE 3 of 10 |

## § 1010.8    FORMS

(a)    Form #2080, "Request for Test of Suspected Contraband Drugs"

FORM 2080 (5/13)        STATE OF NEW YORK - DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION

### REQUEST FOR TEST OF SUSPECTED CONTRABAND DRUGS

| Inmate Name | | Number | | Cell |
|---|---|---|---|---|
| Request made by | | Date | | |
| Substance suspected | | Approximate amount | | |

Circumstances leading to request

(continue on back if additional space is needed)

| Supervisor receiving request | | | Date | | |
|---|---|---|---|---|---|
| If a capsule, was it inspected at pharmacy?  Yes ☐  No ☐ | Inspected by | Date | Time | Identification | |
| Substance tested by | | Date | Time | | |

Results

Method of testing

| Was any of the substance left after testing?  Yes ☐  No ☐ | Was remaining substance forwarded to State Police lab?  Yes ☐  No ☐ | Date | Time | |
|---|---|---|---|---|
| Manner | Results | Date | | |

**CHAIN OF CUSTODY (Starting with the Officer who found the substance)**

| From | To | Date | Time |
|---|---|---|---|
| From | To | Date | Time |
| From | To | Date | Time |
| From | To | Date | Time |
| From | To | Date | Time |
| From | To | Date | Time |
| From | To | Date | Time |
| From | To | Date | Time |
| From | To | Date | Time |
| From | To | Date | Time |

This form is to be filled out completely. It is to accompany the suspected substance until the substance is tested. After the substance is tested, this form is to be delivered to the office responsible for inmate discipline regardless of the results. If the substance proves to be a contraband drug, a misbehavior report shall be written.

(c)    "NIK Public Safety Statement of Scientific Principles"

## NIK® PUBLIC SAFETY
## SYSTEM OF NARCOTICS IDENTIFICATION

NIK® Public Safety developed the NIK® System of Narcotics Identification as a means of rapidly screening and presumptively identifying substances suspected of being abused drugs, narcotics and hallucinogens. Designed to be a completely self-contained system, the kit in its several configurations, provides all necessary elements to perform chemical color tests for the commonly known and most frequently abused narcotics and dangerous drugs.

Each test pack contains the chemical required to perform the desired test in pre-filled, hermetically sealed glass ampoules. This eliminates the need for measuring, mixing and dispensing of reagents while affording a maximum of protection to the investigator. Reagent shelf life is also substantially prolonged by this method of packaging. Chemicals used are ACS grade or better, providing the highest rate of accuracy.

The NIK® System is designed to function as a transportable-mininarcotics identification laboratory. It may be carried with you and is, therefore, available for use wherever and whenever the need may arise.

### COLORIMETRIC CHEMICAL TESTING

The NIK® System employs chemical colorimetric comparison as the means by which narcotics and other controlled substances are screened and presumptively identified. Each test pack contains one or more chemical reagents which will predictably develop a color or a series of colors in the presence of the most commonly known narcotics and dangerous drugs. When the predicted color reaction occurs while following the recommended test sequence, a positive identification is presumed. A positive identification is considered a component of probable cause and generally recognized within our legal system as being presumptive in nature.

### NIK® POLYTESTING SYSTEM

The NIK® System of Narcotics Identification is based upon a poly testing procedure whereby a suspect material is subjected to a series of progressively discriminating screening tests. The results of a single test may or may not yield a valid result. However, the sequential results of several tests, if they all indicate a positive reaction for a particular substance, provides a high degree of certainty that the suspect material is in fact what the NIK® Poly testing System indicates it to be.

Experiments have been and continue to be conducted with hundreds of licit and illicit chemical compounds in a continuing effort to eliminate false positive results. No chemical reagent system, adaptable to field use exists, that will completely eliminate the occurrence of an occasional invalid test result. A complete forensic laboratory would be required to qualitatively identify an unknown suspect substance. In absence of such a laboratory facility, the NIK® System, utilizing the recommended Poly testing procedure, is your best assurance that the presumptive results of a positive identification are what they appear to be.

### NIK® TESTING CAPABILITY

The NIK® System will presumptively identify most substances which fall within the following general groups of abused drugs:

A. Cannabis sativa L.     B. Depressants     C. Hallucinogens
D. Narcotics             E. Stimulants

(d)   "Sirchie NARK® II Statement of Scientific Principles"

## SIRCHIE NARK® II
## SYSTEM OF NARCOTICS IDENTIFICATION

Sirchie's NARK® II Progressive System for Drug Identification has the capability of presumptively identifying several families of substances suspected of being abused drugs. Designed to function as a transportable narcotics laboratory, it is available for use wherever the need for its capability might arise. Each of the tests is comprised of one or more chemical reagents based on National Institute of Justice Standard 0604.01 and/or UN Standard ST/NR/13RE V1. When a predictable color or series of colors occur within a specific testing sequence, a positive identification may be presumed.

### COLORIMETRIC CHEMICAL TESTING

The NARK® II System employs chemical colorimetric comparison as the means by which narcotics and other controlled substances are screened and presumptively identified. Each test pack contains one or more chemical reagents which will predictably develop a color or a series of colors in the presence of the most commonly known narcotics and dangerous drugs. When the predicted color reaction occurs while following the recommended test sequence, a positive identification is presumed. A positive identification is considered a component of probable cause and generally recognized within our legal system as being presumptive in nature.

### Interpretation of Generated Colors

For purposes of colorimetric confirmation, it is not required that you obtain an exact color match. Your colors, however, must fall within a general area of the targeted family of color(s) referenced for that particular substance. Continue to keep in mind three important factors when reviewing your generated colors:

1. The basic color or lack of color.

2. Any color shift or change: e.g., orange to brown.

3. The location of colors within the test pouch.

### NARK® II POLYTESTING SYSTEM

The NARK® II System of Narcotics Identification is based upon a poly testing procedure whereby a suspect material is subjected to a series of progressively discriminating screening tests. The results of a single test may or may not yield a valid result. However, the sequential results of several tests, if they all indicate a positive reaction for a particular substance, provides a high degree of certainty that the suspect material is in fact what the NARK® II testing indicates it to be.

Experiments have been and continue to be conducted with hundreds of licit and illicit chemical compounds in a continuing effort to eliminate false positive results. No chemical reagent system, adaptable to field use exists, that will completely eliminate the occurrence of an occasional invalid test result. A complete forensic laboratory would be required to qualitatively identify an unknown suspect substance. In absence of such a laboratory facility, the NARK® II testing, utilizing the recommended procedure, is your best assurance that the presumptive results of a positive identification are what they appear to be.

## NARK® II NARCOTICS IDENTIFICATION SYSTEM  -  NARK® II TESTS

**NARK2001: Marquis Reagent** – general screening test designed as the start of the Progressive Testing System

**NARK2002: Nitric Acid Reagent** – designed to differentiate between Heroin and Morphine

**NARK2003: Dille-Koppanyi Reagent** – designed to presumptively identify the presence of Barbiturates

**NARK2004: Ehrlich's Reagent** – designed to presumptively identify the presence of LSD

**NARK2005: Duquenois-Levine Reagent** – designed to presumptively identify the presence of THC is substances like Marijuana, Hashish, Hash Oil and other THC concentrates (DAB, Wax, BHO)

**NARK2006: Acid Neutralizer** – designed to neutralizer chemistry prior to disposal of the field test

**NARK2007: Scott Reagent Modified** – designed to presumptively identify the presence of Cocaine HCl (powder) and Cocaine Base (crack/freebase)

**NARK2008: Methadone Reagent** – designed to presumptively identify the presence of Methadone

**NARK2009: PCP/Methaqualone Reagent** – designed to presumptively identify the presence of PCP/Methaqualone

**NARK20010: Special Opiates Reagent** – designed to presumptively identify the presence of fully synthetic opiates (Oxycodone, Hydrocodone, Fentanyl, Buprenorphine, Desomorphine and Zohydro) as well as semi-synthetic opiates (Heroin and Morphine)

**NARK20011: Mecke's Reagent Modified** – designed to presumptively identify the presence of Heroin and Morphine

**NARK20012: Talwin Reagent** – designed to presumptively identify the presence of Talwin (Pentazocine)

**NARK20013: Ephedrine Reagent** – designed to presumptively identify the presence of Ephedrine and Pseudoephedrine

**NARK20014: Valium Reagent** – designed to presumptively identify the presence of Valium and Ketamine

**NARK20015: Sodium Nitroprusside Reagent** – designed to presumptively identify the secondary amines present in MDMA (Ecstasy) and Methamphetamine

**NARK20019: Mayers** – general screening test only

**NARK20020: KN (Fast Blue Salts) Reagent** – designed to presumptively identify the presence of trace THC found on seeds or green plant material

**NARK20021: GHB Reagent** – designed to presumptively identify the presence of GHB

     

**Department of Correctional Services**
Inmate Photographs

C010MJO - 2/29/2016 7:50 AM

Close





### INMATE INFORMATION:

| | | | |
|---|---|---|---|
| Name: | **:AGEE, JKENDRIC** | | |
| DIN: | **08B1474** | Status: | **IN CUSTODY** |
| NYSID: | **02697786L** | Owning Facility: | **AUBURN GENERAL** |
| Gender: | **MALE** | Race: | **BLACK** |
| Date of Birth: | **8/10/1991** | Ethnicity: | **NOT HISPANIC** |

### PHYSICAL CHARACTERISTICS:

| | | | |
|---|---|---|---|
| Hair: | **BROWN** | Height: | **6'** |
| Eyes: | **BLACK** | Weight: | **266** |

**SCAR: R/WRIST,L/ANKLE**

### PHOTO INFORMATION:

Facility Taken: **AUBURN**
Date Taken: **2/24/2016 1:02 PM**



## CERTIFICATION

I ,Sherri Guzylak , being employed by the New York State Department of Corrections and Community Supervision (DOCCS) in the position of Inmate Records Coordinator II, have reviewed the attached documents and hereby state and certify that they are the complete, true and exact copy of the Legal File for inmate JKENDRIC AGEE 08B1474. The attached records are maintained in the regular course of business of DOCCS and, with regard to the attached records that were created by employees of DOCCS, I certify that those records were made in the regular course of business of DOCCS; that it was in the regular course of business of DOCCS to make them at the time of the condition, act, transaction, occurrence or event documented in such records, or within a reasonable time thereafter; and that the employees who created the records had a duty to truthfully record such condition, act, transaction, occurrence or event.

However, as to records which were not created specifically by employees of the DOCCS, and which were received from other agencies, departments, businesses or individuals, I certify only that the record is a true and accurate copy of the record contained or maintained in the Legal File for inmate JKENDRIC AGEE.

Witness my hand and seal on this _23th_ day of _March_   2016.

Sworn to before me this
23 day of March      2016.

Notary Public

TIMOTHY J. HODSON
01HO6267324
NOTARY PUBLIC, STATE OF NEW YORK
QUALIFIED IN CAYUGA COUNTY
COMMISSION EXPIRES ON 09/10/2016

STATE OF NEW YORK
DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION
AUBURN CORRECTIONAL FACILITY

ARRIVAL INTERVIEW

| Din #: | O8B1474 |
| Name: | A-Gee. |
| Cell #: | A-8-20 |

I feel that I have no need for protection from anyone here at Auburn Correctional Facility.
I feel, at this time, that there is no threat to my life by remaining in general population.

Inmate's Signature: _____   7/11/15.

I have received the following:       (1) Standards of Inmate Behavior All Institutions Rule Book.

(i) Disposable State Razor.   _____

Inmate's Signature: _____

| TIER DISPOSITIONS | RELEASE DATE |
|---|---|
| Special Housing Unit | |
| Keep Locked | |
| Loss of Recreation | |
| Loss of Packages | |
| Loss of Commissary | |
| Loss of Phone | |
| Loss of Special Events | |

Interviewer's Name & Title: L.Cole, Sergeant

Signature: _____

Date: 7/11/15

# CERTIFICATION

I ,Sherri Guzylak , being employed by the New York State Department of Corrections and Community Supervision (DOCCS) in the position of Inmate Records Coordinator II, have reviewed the attached documents and hereby state and certify that they are the complete, true and exact copy of the Legal File for inmate JKENDRIC AGEE 08B1474. The attached records are maintained in the regular course of business of DOCCS and, with regard to the attached records that were created by employees of DOCCS, I certify that those records were made in the regular course of business of DOCCS; that it was in the regular course of business of DOCCS to make them at the time of the condition, act, transaction, occurrence or event documented in such records, or within a reasonable time thereafter; and that the employees who created the records had a duty to truthfully record such condition, act, transaction, occurrence or event.

However, as to records which were not created specifically by employees of the DOCCS, and which were received from other agencies, departments, businesses or individuals, I certify only that the record is a true and accurate copy of the record contained or maintained in the Legal File for inmate JKENDRIC AGEE.

Witness my hand and seal on this _23th_ day of _March_ 2016.

_signature_

Sworn to before me this
23 day of _March_ 2016.

_signature_
Notary Public

```
03/22/16     SLOC010        LOCATOR SYSTEM       *FPMS*         PAGE 001
                        CHRONOLOGICAL HISTORY DISPLAY
                             01 AUBURN GENER
   DIN 08B1474      NYSID 02697786L   FACILITY OFF COUNTS      LOCATION
   NAME AGEE, JKENDRIC                      DOB 08/10/91   SEX M   E/R NB
```

| EFFECTIVE DATE | DATE ENTERED | SENDING FACILITY | RECEIVING FAC/ OUTCOUNT LOCATION | TRANSACTION TYPE | CELL |
|---|---|---|---|---|---|
| 05/13/08 | 05/13/08 |  | WENDE RECEP | NEW COMMIT | 0C-13-07S |
| 05/15/08 | 05/15/08 | WENDE RECEP | ELMIRA RECEP | TRANSFER OUT | 0C-13-07S |
| 05/15/08 | 05/15/08 | WENDE RECEP | ELMIRA RECEP | TRANSFER IN | 0B-05-05S |
| 05/27/08 | 05/27/08 | ELMIRA RECEP | GREENE | TRANSFER OUT | 0A-04-24S |
| 05/27/08 | 05/27/08 | ELMIRA RECEP | DWNSTATE REC | INTRANS RECV | 02-0C-033 |
| 05/28/08 | 05/28/08 | DWNSTATE REC | GREENE | INTRANS SENT | 02-0C-033 |
| 05/28/08 | 05/28/08 | ELMIRA RECEP | GREENE | TRANSFER IN | 0F-01-26B |
| 07/10/08 | 07/10/08 | GREENE | GREEN SHU200 | INTRANS SENT | SH-00-007 |
| 07/10/08 | 07/10/08 | GREENE | GREEN SHU200 | INTRANS RECV | 0S-A2-44B |
| 09/26/08 | 09/26/08 | GREENE | FISHK SHU200 | TRANSFER OUT | 0S-B2-27B |
| 09/26/08 | 09/26/08 | GREENE | FISHK SHU200 | TRANSFER IN | 0S-A1-17B |
| 12/09/08 | 12/09/08 | FISHK SHU200 | WENDE | TRANSFER OUT | 0S-C2-44T |
| 12/09/08 | 12/09/08 | FISHK SHU200 | WENDE | TRANSFER IN | 0A-06-02T |
| 01/11/10 | 01/11/10 | WENDE | ORLNS SHU200 | TRANSFER OUT | 0A-04-01T |
| 01/11/10 | 01/11/10 | WENDE | ORLNS SHU200 | TRANSFER IN | 0S-A1-08B |
| 02/04/10 | 02/04/10 | ORLNS SHU200 | ORLEANS | INTRANS SENT | 0S-A1-08T |
| 02/04/10 | 02/04/10 | ORLNS SHU200 | ORLEANS | INTRANS RECV | HS-0B-001 |
| 02/05/10 | 02/05/10 | ORLEANS | ORLNS SHU200 | INTRANS SENT | HS-0B-001 |
| 02/05/10 | 02/05/10 | ORLEANS | ORLNS SHU200 | INTRANS RECV | 0S-A1-08T |
| 02/16/10 | 02/16/10 | ORLNS SHU200 | FIVE POINTS | TRANSFER OUT | 0S-A1-08T |
| 02/16/10 | 02/16/10 | ORLNS SHU200 | AUBURN DEPOT | INTRANS RECV | 0D-08-17T |
| 02/18/10 | 02/18/10 | AUBURN DEPOT | FIVE POINTS | INTRANS SENT | 0D-08-17T |
| 02/18/10 | 02/18/10 | ORLNS SHU200 | FIVE POINTS | TRANSFER IN | 09-C2-48T |
| 07/12/10 | 07/12/10 | FIVE POINTS | CAYUG SHU200 | TRANSFER OUT | 12-C1-21B |
| 07/12/10 | 07/12/10 | FIVE POINTS | CAYUG SHU200 | TRANSFER IN | 0S-A1-19B |
| 09/09/10 | 09/09/10 | CAYUG SHU200 | CLINTON GEN | TRANSFER OUT | 0S-A2-45B |
| 09/09/10 | 09/09/10 | CAYUG SHU200 | AUBURN DEPOT | INTRANS RECV | 0D-08-30B |
| 09/10/10 | 09/10/10 | AUBURN DEPOT | CLINTON GEN | INTRANS SENT | 0D-08-30B |
| 09/10/10 | 09/10/10 | AUBURN DEPOT | DWNSTATE REC | INTRANS RECV | 03-0H-003 |
| 09/13/10 | 09/13/10 | DWNSTATE REC | CLINTON GEN | INTRANS SENT | 03-0H-003 |
| 09/13/10 | 09/13/10 | CAYUG SHU200 | CLINTON GEN | TRANSFER IN | LF-01-26S |
| 07/08/11 | 07/08/11 | CLINTON GEN |  | ME PRS PAR | UF-10-047 |
| 10/03/13 | 10/03/13 |  | WENDE RECEP | PRSV NO NT | 0C-13-14S |
| 10/04/13 | 10/04/13 | WENDE RECEP | ELMIRA RECEP | TRANSFER OUT | 0C-13-14S |
| 10/04/13 | 10/04/13 | WENDE RECEP | ELMIRA RECEP | TRANSFER IN | 0A-01-04S |
| 10/24/13 | 10/24/13 | ELMIRA RECEP | ATTICA GEN | TRANSFER OUT | 0A-01-04S |
| 10/24/13 | 10/24/13 | ELMIRA RECEP | ATTICA GEN | TRANSFER IN | 0D-40-05S |
| 07/10/14 | 07/10/14 | ATTICA GEN |  | PAR PAROLE | E2-53-03B |
| 06/30/15 | 06/30/15 |  | WENDE RECEP | PRSV NO NT | 0C-13-17S |
| 07/02/15 | 07/02/15 | WENDE RECEP | ELMIRA RECEP | TRANSFER OUT | 0C-13-17S |
| 07/02/15 | 07/02/15 | WENDE RECEP | ELMIRA RECEP | TRANSFER IN | 0A-05-37S |
| 07/10/15 | 07/10/15 | ELMIRA RECEP | AUBURN GENER | TRANSFER OUT | 0A-05-37S |
| 07/10/15 | 07/10/15 | ELMIRA RECEP | AUBURN GENER | TRANSFER IN | 0A-08-20S |
| 03/09/16 | 03/09/16 | AUBURN GENER |  | PAR PAROLE | SH-UF-002 |

NOTE: THIS REPORT WAS RECONSTRUCTED USING HISTORICAL INMATE MOVEMENT DATA FROM
      COMPUTER RECORDS, AND IS ONLY AS ACCURATE AS IT WAS MAINTAINED BY THE
      FACILITY FOR THIS TIME PERIOD.

## CERTIFICATION

I ,Sherri Guzylak , being employed by the New York State Department of Corrections and Community Supervision (DOCCS) in the position of Inmate Records Coordinator II, have reviewed the attached documents and hereby state and certify that they are the complete, true and exact copy of the Legal File for inmate JKENDRIC AGEE 08B1474. The attached records are maintained in the regular course of business of DOCCS and, with regard to the attached records that were created by employees of DOCCS, I certify that those records were made in the regular course of business of DOCCS; that it was in the regular course of business of DOCCS to make them at the time of the condition, act, transaction, occurrence or event documented in such records, or within a reasonable time thereafter; and that the employees who created the records had a duty to truthfully record such condition, act, transaction, occurrence or event.

However, as to records which were not created specifically by employees of the DOCCS, and which were received from other agencies, departments, businesses or individuals, I certify only that the record is a true and accurate copy of the record contained or maintained in the Legal File for inmate JKENDRIC AGEE.

Witness my hand and seal on this  23th day of  March   2016.

_Sherri L Guzylak_

Sworn to before me this
23 day of  March  2016.

_Timothy J Hodson_
Notary Public

TIMOTHY J. HODSON
01HO6267324
NOTARY PUBLIC, STATE OF NEW YORK
QUALIFIED IN CAYUGA COUN
COMMISSION EXPIRES ON

TIMOTHY J. HODSON
01HO6267324
NOTARY PUBLIC, STATE OF NEW YORK
QUALIFIED IN CAYUGA COUNTY
COMMISSION EXPIRES ON 09/10/2016

03/22/16                          LOCATOR SYSTEM                          KLOCM6B
                           INTERNAL MOVEMENT HISTORY DISPLAY
                                   01 AUBURN
DIN 08-B-1474   NYSID 02697786-L  FACILITY OFF COUNTS      LOCATION
NAME AGEE, JKENDRIC                         DOB 08/10/91   SEX M   E/R NB

|              | EFFECTIVE | DATE    |             |             |
| FACILITY     | DATE      | ENTERED | FROM        | TO          |
|--------------|-----------|---------|-------------|-------------|
| AUBURN GENER | 08/21/15  | 08/21/15| UNEM A/ ELEC| UNEM A/P    |
|              |           |         | TRDS P      |             |
|              | 09/12/15  | 09/12/15| UNEM A/P    | E. TRADES AM|
|              |           |         |             | UNEMP PM    |
|              | 02/03/16  | 02/03/16| 0A-08-20S   | 0D-07-27S   |
|              | 02/27/16  | 02/27/16| E. TRADES AM| UNEMP A/P   |
|              |           |         | UNEMP PM    |             |
|              | 02/28/16  | 02/28/16| 0D-07-27S   | SH-UK-005   |
|              | 02/28/16  | 02/28/16| SH-UK-005   | HS-0I-008   |
|              | 02/28/16  | 02/28/16| HS-0I-008   | HS-0I-009   |
|              | 02/29/16  | 02/29/16| HS-0I-009   | MH-OB-004   |
|              |           |         | UNEMP A/P   | UNEM A/P    |
|              | 02/29/16  | 02/29/16| MH-OB-004   | MH-OB-006   |

<ENTER> CONTINUE   <PF3> EXIT(FUNCTION)     <PF4> RETURN   <CLEAR> EXIT(SYSTEM)
                   <PF7> SCROLL BACKWARD    <PF8> SCROLL FORWARD

11:47:21 Tuesday, March 22, 2016

03/22/16                    LOCATOR SYSTEM                        KLOCM6B
                    INTERNAL MOVEMENT HISTORY DISPLAY
                            01 AUBURN
  DIN 08-B-1474   NYSID 02697786-L  FACILITY OFF COUNTS    LOCATION
  NAME AGEE, JKENDRIC                    DOB 08/10/91   SEX M   E/R NB


                    EFFECTIVE    DATE
            FACILITY    DATE     ENTERED      FROM            TO
         AUBURN GENER  03/01/16  03/01/16  MH-OB-006     SH-UF-002




                 **  AT END OF REQUESTED HISTORY SCAN  **
    <ENTER> CONTINUE   <PF3> EXIT(FUNCTION)    <PF4> RETURN   <CLEAR> EXIT(SYSTEM)
                  <PF7> SCROLL BACKWARD    <PF8> SCROLL FORWARD